[Civ. No. 8271.   Fourth Dist., Div. Two.   Dec. 7, 1967.]

ATCHISON, TOPEKA & SANTA FE RAILROAD COMPANY, Cross-complainant and Respondent, v. FLINTKOTE COMPANY, Cross-defendant and Appellant.

Ball, Hunt, Hart & Brown, Ball, Hunt & Hart and Clark Heggeness for Cross-defendant and Appellant.

John J. Balluff, Henry M. Moffat, Welsh, Cummins & White, Cummins, White & Breidenbach and Joseph H. Cummins for Cross-complainant and Respondent.

KERRIGAN, J.—On October 29, 1962, at 3:04 p.m., a model 1956 International 10-wheel dump truck, loaded with 14½ tons of gravel, collided with a Santa Fe passenger train at Katella Boulevard and the Santa Fe tracks in Orange County. The automatic signal light was flashing at the time of the collision, and the accident resulted from a failure of the truck's brakes. The force of the impact resulted in a derailment of some of the passenger cars, causing them to "lay over" on a bridge approximately one-half mile down the tracks from the collision site. The truck driver and a passenger on the train were killed and over 30 passengers on the train were injured. The truck was owned by Laura Claussen and driven by Edward White. Several passengers, including the plaintiff herein, filed separate suits against Santa Fe, Laura Claussen, Edward White's estate, and the Flintkote Company, a corporation, doing business as Blue Diamond Company, a division of Flintkote, a firm for which the truck was being utilized in hauling materials at the time of the accident. The railroad countered by filing a cross-complaint against Laura Claussen and Blue Diamond for property damage to the train. The Santa Fe property damage claim was embodied in the cross-complaint filed in this action, and was also asserted in the same form in two companion cases involving other passengers. Pursuant to stipulation of counsel, it was agreed that any judgment secured on the cross-complaint in this suit would be effective not only in this case, but also would constitute a judgment on the cross-claims filed in the aforesaid related actions.[1] The actions initiated by the

[1] *Mull* v. *Atchison, Topeka & Santa Fe* (4 Civil 8273); *Vandiver* v. *Atchison, Topeka & Santa Fe* (4 Civil 8274).

passengers to recover damages for personal injuries were compromised prior to trial. When the case was called for trial, the only unsettled claim involved the Santa Fe's cross-claims against Laura Claussen and Blue Diamond for recovery of property damages to the train.

On the first day of trial, Santa Fe compromised its claim against Laura Claussen for $9,825, and executed a covenant not to sue. The action then proceeded to trial solely against Blue Diamond. Santa Fe sought recovery against Blue Diamond upon two theories: (1) The independent negligence of Blue Diamond; and (2) an agency relationship existed between the shipper and the hauler. Blue Diamond denied the allegations and maintained that Laura Claussen was not an agent, but an independent contractor.

At the climax of the jury trial, the court granted a nonsuit on the cause of action alleging independent negligence of Blue Diamond, thus limiting the issue solely to vicarious responsibility. While liability for the collision was not admitted, the evidence clearly establishes that faulty brakes on the truck was the sole, direct and proximate cause of the accident. The truck had lost 60 percent of its braking power; someone had intentionally crimped the air lines to the front brakes; and the brakes on the rear axle were totally ineffective because the brake drums had been "turned" or ground down beyond the safe limit allowing the brake cams, which push the brake shoes against the drums, to turn over completely.

Santa Fe claimed damages in the sum of $71,000. However, by reason of the Laura Claussen settlement, plus amounts secured by way of compromise with other cross-defendants not here involved, Santa Fe had received some $16,000 for covenants not to sue. The jury trial resulted in a judgment for Santa Fe against Blue Diamond in the sum of $25,000.

Because the cardinal issue on appeal relates solely to the issue as to whether Laura Claussen was the agent of Blue Diamond, or was acting in the capacity of an independent contractor, it is advisable that we relate in some detail the history of her business relationship with Blue Diamond.

In 1959 Elmer Claussen, Laura's spouse, owned the International gravel truck involved in this collision. He held a radial highway common carrier permit issued by the Public Utilities Commission. On August 12, 1959, he entered into a written "hauling contract" with Blue Diamond. Blue Diamond owns and operates a gravel and building materials yard

in Orange, California. The contract provided that Claussen would transport gravel and other materials for Blue Diamond as an independent contractor. After signing the contract Elmer Claussen commenced to transport materials owned by Blue Diamond. Most of the materials were transported from the bulk plant at Orange, California to Blue Diamond's ready-mix batch plant at Stanton, California. With few exceptions, the hauls were made within a range of 50 miles.

In October 1961, following the revocation of Elmer's driving privilege, Edward White was hired to drive the truck. In March 1962 Elmer was unable to get the liability insurance on the truck renewed as required by the Public Utilities Commission, and he thereupon transferred ownership of the truck to his wife and had her obtain a radial common carrier permit. Elmer advised the Blue Diamond dispatcher that the Public Utilities permit was in his wife's name, and thereafter Blue Diamond paid Laura Claussen for the hauling services.

Laura never signed a contract with Blue Diamond. The truck involved in the train accident was the only one Laura owned or operated. On the date of the accident in late 1962, the truck was used exclusively in the service of Blue Diamond and utilized for the sole purpose of transporting Blue Diamond's products, consisting of rock, sand and gravel.

Thus, from August 1959 to the date of the accident, the truck had been in the exclusive service of Blue Diamond. It was utilized five to five and one-half days per week during the entire period. For over three years preceding the accident essentially all of the hauling for Blue Diamond from its bulk plant at Orange was done by 12 individual truck owners, all of whom, except Laura, had signed hauling contracts with Blue Diamond. The 12 haulers were divided into three groups of four each. One group would report to work first each morning; the other two groups reported at a later time. The groups would alternate so that each group had an earlier reporting time once every three days.

Elmer Claussen, when he was operating the truck, and similarly Edward White, when he took over the driving duties, arrived at the Blue Diamond plant at Orange in the morning. The Blue Diamond dispatcher would take the incoming orders, and as an order came in, he, or the weighmaster, would advise the truck drivers as to the nature of the material to be hauled, and the destination thereof. The drivers had to wait for an order before the trucks were loaded. The dis-

patcher would inform the truck drivers as to the best route to take to reach a destination in the event a driver was unfamiliar with the best direction. The dispatcher occasionally cautioned the truckers to obey speed limits and to avoid spillage. At times Blue Diamond would display safety signs such as "Watch that Child" in the dispatch cabin. However, the drivers were not given any written or oral instructions as to the manner in which they should operate or maintain their respective trucks. Blue Diamond did not inspect the trucks nor did the drivers wear Blue Diamond uniforms. Nevertheless, Blue Diamond did exercise a limited amount of control at the plant. The drivers were not allowed to remain on the trucks while they were being loaded, but the driver had the right to decide the maximum amount of gravel to be loaded on his truck. In the event a driver came into the plant with a noticeable air leak, the dispatcher or weighmaster would notify the driver to fix the defect. If the weighmaster or dispatcher saw anything wrong with the truck and that the truck was not safe to operate, they refused to load it. Blue Diamond employees told each driver the time to report to work the following morning and which drivers would be permitted to load first. The dispatcher maintained a priority list in his office. While Blue Diamond used its own trucks occasionally for hauling some materials, such hauling by Blue Diamond trucks was extremely seldom, and at the time of the accident, there were no Blue Diamond trucks bearing the company's markings at the Orange plant.

Evidently hauling for Blue Diamond was considered a valuable "spot" involving good pay and steady work. There were no "five percenters" requiring the payment of a 5 percent commission to firms or organizations to obtain jobs for truckers. While extra trucks called "outlaws" were usually at the plant and waiting for extra work, Blue Diamond always loaded the regular trucks first. The drivers generally hauled from the Orange bulk plant to the Stanton ready-mix. Of the 12 regular drivers, apparently only one left Blue Diamond's service during the three years preceding the accident. With a few possible exceptions, all of the 12 regular drivers hauled for no one but Blue Diamond. All Blue Diamond Orange plant materials were hauled by the regular drivers except when occasional extra trucks were required due to an increase in business.

The hauling contracts executed between Blue Diamond and

the regular drivers were not negotiated contracts. The drivers merely signed a form presented by the dispatcher. The truck owner merely filled out the form and signed it before he was allowed to haul. There were no conferences between the truck owners and Blue Diamond with respect to terms inasmuch as the conditions were set exclusively by Blue Diamond. All the truck owners had actually signed the hauling contract form with the sole exception of Mrs. Claussen.

About 11 a.m. on the morning of the accident, White called Laura Claussen and told her he had been by a brake shop and had a cost figure for brake repairs. About 12:30-1 p.m. Laura called the Blue Diamond dispatcher, who informed her that White was expected at the Orange plant about 2-2:30 p.m. Laura asked the dispatcher to give White a message to go to the brake shop as soon as he arrived. and the dispatcher indicated he would relay the message. The dispatcher thereafter gave White the message and asked if it was safe to take another load. White said he thought it was and the truck was loaded. Manifestly, the repairs were never effected.

Blue Diamond's appeal is predicated on two grounds: (1) The trial court improperly instructed the jury on the issue of agency; and (2) the evidence is insufficient to support a finding that Laura Claussen was the agent of Blue Diamond inasmuch as there is no evidence that Blue Diamond had the right to control, or that it exercised control over the truck owner or her driver.

The instructions stated, in substance: (1) That Laura Claussen could not lawfully haul exclusively for just one shipper under her radial highway common carrier permit; and (2) that a presumption exists that Laura Claussen obeyed the law and, if she did not hold a *highway contract carrier* permit, the presumption of her compliance with the law is evidence from which the jury could reasonably infer that Laura Claussen was acting as agent or employee of Blue Diamond since she was not authorized by a *radial common carrier* permit to serve Blue Diamond exclusively.

The two specific instructions on agency read verbatim as follows:

"A corporation or person holding a radial highway common carrier permit must secure a highway contract carrier permit in order lawfully to perform service under a special contract with only one shipper."

"It is presumed that in transporting property belonging to

Blue Diamond, Laura Claussen and Edward White were innocent of crime and were obeying the law. If Laura Claussen did not hold a valid permit issued by the Public Utilities Commission for the type of transportation she was providing, the presumption of innocence is evidence she and her driver were not acting as an independent contractor since to do so would be unlawful.''

In essence, the initial instruction informed the jury that Laura Claussen was required to have a contract carrier permit. The second instruction advised the jury, in effect, that if she did not hold a *contract carrier* permit she was presumed to be the agent of Blue Diamond. The evidence is undisputed that Laura Claussen held a *radial* but not a *contract* permit, and the import of the two instructions was that Laura Claussen was presumed to be the agent of Blue Diamond.

There are basically three types of operating authority required by California law (Pub. Util. Code, § 3501 et seq.)[2] (1) highway common carrier; (2) radial highway common carrier; and (3) highway contract carrier. ■ A highway *common carrier* is a public utility engaged in the transportation of property on the highways and is regulated as a public utility; a highway common carrier dedicates his facility to the public and ordinarily operates between fixed termini or over regular routes; a highway common carrier is required to obtain a certificate of public convenience and necessity from the Public Utilities Commission. (Pub. Util. Code, §§ 213, 215, 3513.) ■ A *radial* highway *common carrier* engages in the transportation of property on the highways, but is not regulated as a public utility; a radial highway common carrier does not operate between fixed termini or over regular routes; he establishes his own rates until rates are fixed by the Commission; he is required to secure a permit, not a certificate of public convenience and necessity; the essential difference between a common carrier and a radial common carrier is that the latter carrier does not operate between fixed termini or over regular routes. (*Alves* v. *Public Utilities Com.*, 41 Cal.2d 344, 350 [260 P.2d 785]; Pub. Util. Code, § 3516.) ■ A highway *contract carrier* engages in the transportation of property on the highways but does not dedicate his facilities to the public; he transports goods and mate-

[2]Formerly, the Highway Carriers' Act, Stats. 1935, ch. 223, p. 878, as amended; 2 Deering's Gen. Laws, 1949 Supp., Act 5129a, and repealed Stats. 1951, ch. 764, pp. 2025, 2257-2258.

rials from one or more selected shippers under a special contract; he is required to secure a permit as distinguished from a certificate of public convenience and necessity; until fixed by the Commission, he establishes his own rates; thus, a highway contract carrier means every carrier other than a highway common carrier, a radial highway common carrier, and certain petroleum carriers. (Pub. Util. Code, § 3517; *Alves* v. *Public Utilities Com., supra.*)

█ There is judicial authority to the effect that a *radial common carrier* is not required to have a *contract carrier* permit even if he is acting under a special contract with one shipper. (*Ravel* v. *Hubbard*, 112 Cal.App.2d 255 [246 P.2d 88]; *Hill* v. *Progress Co.*, 79 Cal.App.2d 771 [180 P.2d 956].) However, the trial court, in the case under review, relied upon the unreported decision of *Heidlebaugh Wagner Trucking Co.*, 45 CRC 850 [Dec. No. 37176] (See West Anno. Cal. Code, Pub. Util. Code, § 3571, fn. 6), in which the Commission ruled that a trucking company should obtain a *contract carrier* permit to perform a contract for transporting material in dump trucks to a military base. This proceeding was strictly an application by the carrier to secure a contract carrier permit, notwithstanding the fact that it held a radial permit, so as to enable it to charge a rate lesser or different than the minimum rate established by the Railroad Commission. Such unreported decision appears clearly to be in conflict with the rule enunciated in the *Hill* and *Ravel* cases, *supra.*

█ Therefore, it clearly appears that the trial court erred in instructing the jury that Laura Claussen, even though holding a radial highway common carrier permit, was also required to secure a highway contract carrier permit in order lawfully to perform services for Blue Diamond.

Santa Fe urges that inasmuch as Laura Claussen did not hold a highway contract carrier permit the case of *Alford* v. *Bello*, 130 Cal.App.2d 291 [278 P.2d 962], supports the rendition of the trial court's two specific instructions on the doctrine of agency herein. In *Alford* the plaintiff filed an action to recover damages for personal injuries arising out of a highway collision. Plaintiff contended that a carrier, while transporting goods, was an employee of the shipper. The defendant-hauler had no certificate or permit of any kind from the Commission. The court held the carrier was presumed to be acting as an employee of the shipper inasmuch as

if it otherwise held, the carrier would be acting in violation of the Public Utilities Code. The court further utilized the following language in support of its opinion, at page 294:

"It is presumed that a person is innocent of crime or wrong and that the law has been obeyed. (Code Civ. Proc., § 1963, subds. 1, 33.) The presumptions are evidence and if not controverted the trier of fact is bound to find in accordance with them. (18 Cal.Jur.2d 491, § 67.) Bello was transporting property of others for compensation over a public highway by means of a motor vehicle at the time of the accident. The arrangements between Controtto and Bello were entirely oral. It is presumed that in transporting the property he was innocent of crime and was obeying the law. The presumptions are evidence that he was not acting as an independent contractor since if he were acting as such he would be guilty of a crime. It must then be inferred that he was Controtto's employee. No status other than that of employer-employee could have been found under the evidence without disregarding or rebutting the presumption of Bello's innocence of crime and obedience of the law." However, the *Alford* case is clearly distinguishable in that the carrier in the cited case had *no* permit of any kind issued by the state authority. In the instant case, Laura Claussen held a valid operating authority which entitled her to contract with one shipper (*Ravel* v. *Hubbard, supra,* 112 Cal.App.2d 255, 260; *Hill* v. *Progress Co., supra,* 79 Cal.App. 2d 771, 779), and to do so independently (*Williams* v. *Stauffer Chemical Co.,* 146 Cal.App.2d 322, 325-326 [304 P.2d 141].) Consequently, neither the presumption of an employer-employee relationship nor the presumption of innocence would apply.

The giving of the erroneous instructions was certainly prejudicial. In his opening argument to the jury, trial counsel for Santa Fe referred repeatedly to the instructions which the court would render to the jury on the presumption of agency. He urged that Laura Claussen was obliged to hold a contract carrier permit, and that if Laura failed to hold such a permit, she was either guilty of a misdemeanor by reason of such failure or "she was innocent because she was an agent of Blue Diamond," and that therefore the jury should find that she was the innocent agent of Blue Diamond. In final argument, he again urged the jury to find agency rather than determine that Laura and Blue Diamond, in operating under a radial common carrier permit, were guilty of a misdemeanor.

While we are compelled to reverse the judgment because of the fallibility of the instructions, some reference should be made to Blue Diamond's argument that the evidence is insufficient as a matter of law to prove agency.

■ It is well-established that the most important factor in determining whether an individual is an employee or an independent contractor is the right to control the manner and means of accomplishing the result desired. (*Rogers* v. *Whitson*, 228 Cal.App.2d 662, 671 [39 Cal.Rptr. 849] ; *Sparks* v. *L. D. Folsom Co.*, 217 Cal.App.2d 279, 284 [31 Cal.Rptr. 640].)

■ The factual background of the business ties between Laura Claussen and Blue Diamond reflects that the shipper did exercise a degree of actual control over the manner in which the work was to be performed by the hauler's driver, and further demonstrates that Blue Diamond may have enjoyed the right to control the details of the work, even assuming that it did not fully exercise such right. In any event, there was sufficient evidence from which the jury could have reasonably found that an agency relationship existed. The question of whether one is an independent contractor on the one side, or an agent, servant or employee on the other, is ordinarily one of fact. (*Rogers* v. *Whitson, supra*, 228 Cal. App.2d 662, 672; *Borello* v. *Eichler Homes, Inc.*, 221 Cal.App. 2d 487, 497 [34 Cal.Rptr. 648] ; *Frugoli* v. *Conway*, 95 Cal. App.2d 518, 520 [213 P.2d 76].)

Judgment reversed.

McCabe, P. J., and Tamura, J., concurred.

Respondent's petition for a hearing by the Supreme Court was denied January 31, 1968.