[S.F. No. 24279. Nov. 23, 1981.]

ABE L. SAMSON, a Minor, etc., et al., Plaintiffs, Cross-defendants and Respondents, v.
TRANSAMERICA INSURANCE COMPANY, Defendant, Cross-complainant and Appellant;
DALE EUGENE VAGLE et al., Cross-defendants and Respondents.

222

COUNSEL

Memering & DeMers, Louis A. DeMers and Claudia J. Robinson for Defendant, Cross-complainant and Appellant.

David P. Weaver, Jr., and Jay R. Mayhall for Plaintiffs, Cross-defendants and Respondents and for Cross-defendants and Respondents.

Leonard Sacks, Harvey R. Levine, Edward I. Pollock, Robert E. Cartwright, William M. Shernoff, Stephen I. Zetterberg, Arne Werchick, Ian Herzog, Glen T. Bashore, Wylie A. Aitken and Victoria J. DeGoff as Amici Curiae on behalf of Plaintiffs, Cross-defendants and Respondents.

OPINION

**BIRD, C. J.**—The Public Utilities Commission (P.U.C.) requires that all licensed highway carriers obtain liability insurance and, as proof that such insurance meets P.U.C. requirements, attach an endorsement prepared by the P.U.C. to their insurance policies. In this case, the first issue concerns whether the endorsement extends coverage to all vehicles used in the conduct of a highway carrier's business, including vehicles that are not used to transport property. Second, the court must decide whether this insurance company is bound to pay the entire judgment entered against its insured in an action to which it was not a party, because it refused to defend its insured and rejected a settlement offer.

I.

This case involves an appeal from summary judgments granted by the trial court. (Code Civ. Proc., § 437c.) The following facts were established by the affidavits, declarations, admissions and depositions filed before the trial court.

On November 17, 1974, Dale Vagle was driving his pickup truck on the wrong side of the road and collided head-on with a car containing the Samson family. Milagrosa Samson was killed and her husband and two children seriously injured. Vagle later pleaded guilty to a charge of vehicular manslaughter arising out of this accident.

Vagle's pickup truck was insured for $100,000 by State Farm Mutual Automobile Insurance Company (State Farm). He also owned a 1963 International tractor truck with two attachable trailers, and was li-

censed by the P.U.C. as a "radial highway common carrier,"[1] which authorized him to transport property for compensation. The tractor truck and trailers were insured by appellant, Transamerica Insurance Company (Transamerica), for $300,000.

Transamerica's insurance policy contained a standard endorsement prepared by the P.U.C. which stated that the policy would cover any final judgment against the insured for bodily injury or property damage "resulting from the operation, maintenance, or use of motor vehicles for which a . . . permit is required or has been issued to the insured by the [P.U.C.], regardless of whether such motor vehicles are specifically described in the policy or not."[2] The endorsement also indicated that it

---

[1] A radial highway common carrier was a common carrier that did not operate between fixed termini or over regular routes. (*Atchison, Topeka & Santa Fe R.R. Co.* v. *Flintkote Co.* (1967) 256 Cal.App.2d 764, 771 [64 Cal.Rptr. 675]; former Pub. Util. Code, § 3516.) The classification was repealed in 1977. (Stats. 1977, ch. 840, § 3, p. 2519.)

[2] The P.U.C. endorsement, in pertinent part, provided as follows:

"Standard Form of Endorsement Prescribed by the Public Utilities Commission of the State of California

"TO BE ATTACHED TO AND MADE A PART OF ALL POLICIES INSURING MOTOR VEHICLES SUBJECT TO REGULATION BY THE PUBLIC UTILITIES COMMISSION OF THE STATE OF CALIFORNIA

"(Supersedes all endorsements heretofore required by said Commission.)

"The policy to which this endorsement is attached is an Automobile Bodily Injured Liability and Property Damage Liability policy and is hereby amended to assure compliance by the insured, as a motor carrier of property, with General Order No. 100-Series and the pertinent rules and regulations of the Public Utilities Commission of the State of California.

"In consideration of the premium stated in the policy to which this endorsement is attached, the Company hereby agrees to pay, within the limits of liability hereinafter provided, any final judgment rendered against the insured for bodily injury to or death of any person, or loss of or damage to property of others . . . resulting from the operation, maintenance, or use of motor vehicles for which a certificate of public convenience and necessity or permit is required or has been issued to the insured by the Public Utilities Commission of the State of California, regardless of whether such motor vehicles are specifically described in the policy or not.

"Within the limits of liability hereinafter provided it is further understood and agreed that no condition, provision, stipulation, or limitation contained in the policy, or any other endorsement thereon or violation thereof, or of this endorsement, by the insured, shall relieve the Company from liability hereunder or from the payment of any such final judgment, irrespective of the financial responsibility or lack thereof or insolvency or bankruptcy of the insured. However, all terms, conditions, and limitations in the policy to which this endorsement is attached are to remain in full force and effect as binding between the insured and the Company, and the insured agrees to reimburse the Company for any payment made by the Company on account of any accident, claim, or suit involving a breach of the terms of the policy, and for any payment that the Company would not have been obligated to make under the provisions of the policy except for the agreement contained in this endorsement."

was issued to "assure compliance" with P.U.C. General Order No. 100-Series. General Order No. 100-H, in effect at the time of the accident, required each permit holder to deposit with the P.U.C. evidence of insurance protection "covering each vehicle used or to be used in conducting the service performed by each such highway carrier .... "[3]

Vagle was on a personal errand at the time of the accident. However, the pickup truck had commercial license plates and was used regularly in Vagle's trucking business. He carried spare parts for the tractor truck in the pickup, as well as equipment and "wide load" signs. The pickup was used to fetch parts and equipment, to look for work, and to locate routes for transporting wide loads such as mobilehomes.

On December 18, 1974, the surviving members of the Samson family filed suit against Vagle, claiming damages for their own injuries and for the wrongful death of Milagrosa. State Farm assigned Attorney Stephen Gay to the case and advised Vagle to obtain a personal lawyer also since his liability was likely to exceed the State Farm policy limit of $100,000.

On April 28, 1975, Gay sent Transamerica a copy of admissions filed in the Samson v. Vagle action in which Vagle admitted using the pickup truck regularly in his trucking business. In a cover letter, Gay explained that the Samsons were attempting to show that this business

---

[3]General Order No. 100-H provided in pertinent part, "(1) Every highway carrier ... shall provide and thereafter continue in effect, so long as they may be engaged in conducting such operations, adequate protection against liability imposed by law upon such carriers for the payment of damages for personal bodily injuries (including death resulting therefrom) in the amount of not less than one hundred thousand dollars ($100,000) on account of bodily injuries to, or death of, one person; and protection against total liability of such carriers on account of bodily injuries to, or death of more than one person as a result of any one accident, but subject to the same limitation for each person, in the amount of not less than three hundred thousand dollars ($300,000) and protection in the amount of not less than fifty thousand dollars ($50,000) for one accident resulting in damage to or destruction of property other than property being transported by such carrier for any shipper or consignee, whether the property of one or more than one claimant.

"  .   .   .   .   .   .   .   .   .   .   .   .

"(3) The protection required under Sections (1) and (2) hereof shall be evidenced by the deposit with the Public Utilities Commission, covering each vehicle used or to be used in conducting the service performed by each such highway carrier, freight forwarder which operates motor vehicles, and household goods carrier of a policy or policies of public liability and property damage insurance, issued by a company licensed to write such insurance in the State of California, or by nonadmitted insurers subject to Section 1763 of the Insurance Code, if such policies meet the rules promulgated therefor by the Commission; or of a bond of a surety company licensed to write surety bonds in the State of California."

use of the pickup truck brought it within the coverage of the Transamerica policy on the tractor truck. Transamerica received this letter on April 30, 1975.

On March 6, 1975, the Samsons' attorney, David Weaver, contacted Joseph Hebert. Hebert, a Transamerica insurance agent, sold Vagle the insurance policy on his tractor truck. Weaver informed Hebert of the accident and the lawsuit against Vagle. Hebert told Weaver that the Transamerica policy did not cover the pickup truck and refused Weaver's request for a copy of the policy. At Hebert's suggestion, Weaver contacted a Transamerica branch casualty manager, but his request for a copy of the policy was again denied.

On approximately March 17, 1975, Vagle telephoned Hebert to arrange to cancel the Transamerica policy on his tractor truck. He went to Hebert's office a few days later with his wife to return his copy of the policy. Hebert told them that he had been contacted by the Samsons' attorney, Weaver. Hebert said that the pickup truck was not covered by the Transamerica policy and that any contention that it was so covered was "ridiculous."

During the following six months, Transamerica employees exchanged a series of internal office memos and forms concerning the Vagle accident and the Samsons' lawsuit. On May 2, 1975, Robert Lakata, a Transamerica claims representative, sent his superior, Damon Burley, a memo in which he recounted the details of the accident, including the fact that Vagle had been drunk and on the wrong side of the road and that one person had been killed and three others seriously injured. Lakata stated that the plaintiffs' attorney was trying to demonstrate Transamerica coverage, but it was his conclusion that it could not be done.

On June 24, Hebert submitted a preliminary claim form, describing the accident as a "head-on collision." In August, Transamerica opened a file on the claim and established a reserve account for it.

On August 13, 1975, Lakata sent a memo to another Transamerica employee describing a conversation with Gay, Vagle's State Farm attorney. Once again he noted that the Samsons were trying to show coverage under the Transamerica policy. In that memo, Lakata indicated that Gay had told him that the Samsons' attorney valued the case at

$250,000.[4] Lakata concluded by suggesting that the case be referred to the Transamerica legal department so that research could be done on the issue of Transamerica's possible liability.

On August 21, 1975, Transamerica's western zone liability manager sent a memo to Burley, Lakata's supervisor. In it he said, "Suggest we keep out of this and have no conversation with anyone. If the Plaintiffs['] attorney makes some move to get at our policy by some sort of action at law I can't visualize now let's cross the bridge then and not now when we can only speculate." He reiterated the view that the Transamerica policy did not cover Vagle's pickup truck.

Meanwhile, on June 23, 1975, in exchange for State Farm's payment of its $100,000 policy limit, the Samsons signed a "covenant not to execute" against Vagle. Vagle agreed to cooperate in a trial of the action against him and to assign to the Samsons any rights against other insurers, including Transamerica. Transamerica was not informed of this agreement.

In September of 1975, Lakata again suggested to Burley that the matter be referred to the legal department, after two Transamerica underwriters were subpoenaed to produce Transamerica's file on the policy.

The personal injury action, Samson v. Vagle, was tried on the short cause calendar on August 14, 1975. Vagle presented no defense and did not cross-examine witnesses. He did not contest liability or damages. The attorneys for the Samsons and for Vagle told the trial judge that the only other interested party, Transamerica, had been informed of the pendency of the litigation.

The Samsons introduced evidence of Vagle's vehicular manslaughter conviction and Mr. Samson described the injuries he sustained and those of his children. An expert testified as to the value of the loss of the services of Mrs. Samson. The trial court awarded the survivors $350,000 in damages for wrongful death, $110,000 in personal injury damages to Mr. Samson, $175,000 to his daughter, and $90,000 to his son. The total award was $725,000.

---

[4]Gay repeated this assertion in a letter to another attorney. He later stated, at his deposition, that he must have been mistaken in attributing this figure to Weaver.

Three months after the entry of the judgment in the Samson v. Vagle suit, the Samsons' attorney sent Transamerica a copy of the judgment and offered to "compromise" the $625,000 claim against Vagle (the $725,000 judgment minus $100,000 paid by State Farm) for $300,000, the limit of Vagle's policy with Transamerica. Transamerica did not respond.

On January 9, 1976, Vagle assigned his cause of action against Transamerica to the Samsons. On the same day, the Samsons filed suit against Transamerica, seeking the policy limit of $300,000 and an excess judgment of $325,000 for a bad faith refusal to settle.

Vagle joined the Samsons' suit as a plaintiff, claiming damages for emotional distress and attorney fees caused by Transamerica's refusal to settle the claim against him. Transamerica cross-complained against the Samsons, Vagle, the Samsons' attorney, State Farm, and State Farm's attorneys, claiming collusion and bad faith. Demurrers filed by State Farm and its attorneys were sustained by the trial court and the action against them was dismissed.

In June 1977, the Samsons moved for summary judgment. The trial court granted partial summary judgment on September 21, 1977. The Samsons then renewed their motion for summary judgment on the complaint, and it was granted on February 21, 1979.[5] On March 28, 1979, the court granted the cross-defendants' motion for summary judgment on the cross-complaint.

Transamerica appeals from those summary judgments.

## II.

A motion for summary judgment is properly granted if "all the papers submitted show that there is no triable issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." (Code Civ. Proc., § 437c.)

The first question presented by this appeal is whether the trial court correctly concluded that Vagle's pickup truck was covered by the insurance policy issued to him by appellant, Transamerica. The facts re-

---

[5]The motions for summary judgment did not address Vagle's cause of action seeking damages for emotional distress and attorney fees.

lating to this contention are not in dispute. The sole issue is whether, as a matter of law, the insurance contract provides coverage.

Vagle was licensed by the P.U.C. as a radial highway common carrier. (See fn. 1, *ante*, at p. 225.) As a condition of a permit to do business as a highway carrier, the Public Utilities Code requires that the carrier procure "adequate protection" against liability for personal injuries and property damage (Pub. Util. Code, § 3631) and deposit with the P.U.C. either a copy of an insurance policy which meets P.U.C. rules pertaining to such insurance or other evidence of insurance (Pub. Util. Code, § 3632).[6]

At the time of Vagle's accident, the P.U.C. enforced the requirements of sections 3631 and 3632 of the Public Utilities Code through General Order Number 100-H. That order required every highway carrier to obtain protection against liability in amounts not less than $100,000 for bodily injuries or death to one person, $300,000 for bodily injuries or death to more than one person, and $50,000 for property damage. (See fn. 3, *ante*, at p. 226.) It also provided that this protection "be evidenced by the deposit with the Public Utilities Commission, *covering each vehicle used or to be used in conducting the service performed by each such highway carrier* ... of a policy or policies of public liability and property damage insurance ...." (Italics added.)

Pursuant to this P.U.C. regulation, Vagle obtained an insurance policy covering his tractor truck from Transamerica, with the required $100,000/$300,000/$50,000 limits. Attached to the policy was a printed endorsement prepared by the P.U.C., which stated that the attached policy was "hereby amended to assure compliance by the insured, as a motor carrier of property, with General Order No. 100-Series and the pertinent rules and regulations of the Public Utilities Commission of the State of California." (See *ante*, fn. 2, p. 225.) The endorsement stated

---

[6]Public Utilities Code section 3631 provides in pertinent part: "The commission shall, in granting permits pursuant to this chapter, require the highway carrier to procure, and continue in effect during the life of the permit, adequate protection, as provided in Section 3632, against liability imposed by law upon the highway carrier for the payment of damages for personal bodily injuries, including death resulting therefrom ... and protection [against liability for] damage or destruction of property ...."

Public Utilities Code section 3632 provides in pertinent part: "The protection required under Section 3631 shall be evidenced ... [b]y the deposit with the commission, covering each vehicle used or to be used under the permit applied for, ... [o]f a policy of insurance, issued by a company licensed to write such insurance in the state, ... if such policies meet the rules promulgated therefor by the commission ...."

that the insurance company agreed to pay any final judgment rendered against the insured "resulting from the operation, maintenance, or use of *motor vehicles for which a certificate of public convenience and necessity or permit is required or has been issued to the insured* by the Public Utilities Commission of the State of California, *regardless of whether such motor vehicles are specifically described in the policy or not.*" (Italics added.)

■    Where insurance coverage is required by law, the statutory provisions are incorporated into the insurance contract. "The obligations of such a policy are measured and defined by the pertinent statute, and the two together form the insurance contract. . . . [T]he insurance carrier is done no injustice when its rights are determined thereunder. [¶] Any provisions of such a policy which are in conflict with the pertinent statutes are nullified and superseded to that extent, particularly where the policy itself, expressly so provides." (6c Appleman, Insurance Law and Practice (Buckley ed. 1979) § 4463, pp. 615-617, fns. omitted [hereinafter Appleman]. See also *Gardner* v. *Basich Bros. Construction Co.* (1955) 44 Cal.2d 191, 193-194 [281 P.2d 521].)

■    Here, the insurance policy, in the endorsement, referred specifically to the regulations of the P.U.C. and stated that it was designed to comply with the requirements of the "General Order No. 100-Series." Thus, the requirements of the Public Utilities Code and of General Order No. 100-H were made part of the insurance contract by its own provisions as well as by the general rule of construction concerning insurance mandated by statute. Therefore, the insurance contract must be interpreted by reference both to its express terms, and to the relevant statutory and P.U.C. provisions. Where the language of the policy and the statutes is unclear, the courts must look to the policy behind the statutory requirements. (*Boulter* v. *Commercial Standard Ins. Co.* (9th Cir. 1949) 175 F.2d 763, 767; see also 6c Appleman, *supra*, at p. 620.)

By its express terms, the P.U.C. endorsement to Vagle's Transamerica policy provided coverage for all vehicles for which "a permit . . . has been issued," whether or not the vehicles were specified by the underlying policy. Even though the underlying policy covered only Vagle's tractor truck, the endorsement extended coverage to all vehicles covered by his P.U.C. permit. In addition, the P.U.C. General Order No. 100-H which was incorporated into the insurance policy required insurance coverage for all vehicles "used in conducting the service performed by [the] highway carrier."

The crucial question in this case is the interpretation of these two phrases. Was Vagle's pickup truck a vehicle for which a permit had been issued?[7] Was it used in conducting the service Vagle performed as a highway carrier?

The facts relating to the pickup truck are not in dispute. It had commercial license plates. Vagle and his wife owned an additional automobile which they used for most of their personal driving, although Vagle used the pickup for personal business when his wife was using the automobile. He used the pickup regularly to perform tasks incidental to the transportation of property by the tractor truck. The pickup was used to carry tools, spare parts and "wide load" signs, and to obtain parts, search for work and plan routes for transportation of large loads such as mobilehomes. Vagle drove the pickup truck approximately 22,000 miles in 1974, and approximately 15,000 of those miles were for business purposes.

Transamerica argues that restrictive interpretations of the endorsement and general order are proper. It contends that the P.U.C. is concerned only with the regulation of vehicles actually used for hauling property over the highways and with mammoth trucks which pose special dangers to the public because of their size. Transamerica argues that only vehicles actually used for transporting property are covered by a highway carrier's permit. If this is true, the endorsement coverage of vehicles for which "a permit . . . has been issued" would not extend coverage to the pickup truck, since it is used to assist in the hauling operation but not actually used to transport property. In a similar vein, Transamerica contends that the "service" provided by a highway carrier is the transportation of property. Therefore, the general order would apply only to vehicles that actually transport property, and not to the pickup.

This narrow view of the purposes of the P.U.C. regulation of highway carriers is not supported by the applicable statutes or by relevant

---

[7]Resolution of this crucial question is complicated by misleading language in the endorsement, which extends coverage to "motor vehicles" for which a permit has been issued. In fact, the P.U.C. issues permits to businesses, not to individual vehicles. Each highway carrier is required to obtain either a certificate of public convenience and necessity or a permit covering its business operations. (See former Pub. Util. Code, §§ 1063, 3543, 3571, 3582, 3602, 3611, 3621.) The Public Utilities Code does not require the carrier to inform the P.U.C. of the specific vehicles it will operate pursuant to the permit.

P.U.C. decisions and orders. The Highway Carriers' Act begins with a statement that "[t]he use of the public highways for the transportation of property for compensation is a *business* affected with a public interest." (Pub. Util. Code, § 3502. Italics added.) *Businesses* that transport property are required to obtain a P.U.C. certificate or permit. (See fn. 7, *ante*, at p. 232.)

Transamerica has cited no authority which indicates that the jurisdiction of the P.U.C. is limited to the regulation of the particular vehicles which actually transport property. To the contrary, P.U.C. regulations demonstrate a concern with the entire highway carrier business. The Highway Carriers' Act has been interpreted as being designed to protect the public from a broad range of potential problems incidental to the transportation of property. "The paramount purpose of the regulation of the carriers is the protection of the public against ruinous carrier competition and such possible attendant evils as improperly maintained equipment, inadequate insurance, and poor service." (*Keller* v. *Thornton Canning Co.* (1967) 66 Cal.2d 963, 967 [59 Cal.Rptr. 836, 429 P.2d 156].) Particular P.U.C. regulations must be read in light of this broad mandate to protect the public.

The specific requirement that carriers obtain insurance against liability for personal injury and property damage was first added to the code in 1935. (Stats. 1935, ch. 223, § 5, p. 880.) It is phrased in terms of "adequate protection" to the carrier against liability. (Pub. Util. Code, § 3631.) At the same time, it was designed to "protect the public against reckless operation of such vehicles by financially irresponsible owners . . . ." (6c Appleman, *supra*, at p. 614.) The insurance requirement has a dual purpose, protection of the carrier from ruinous judgments and protection of the public from uncompensated injury. (*Argonaut Ins. Co.* v. *Transport Indem. Co.* (1972) 6 Cal.3d 496, 504 [99 Cal.Rptr. 617, 492 P.2d 673].)

Neither of these purposes would be achieved if the scope of the insurance requirement were limited to those vehicles actually used for hauling property. All vehicles are potentially dangerous. The P.U.C. reasonably concluded that both the public and the highway carriers should be protected from the danger posed by uninsured business vehicles. A limitation of this protection to vehicles used to haul property would leave a substantial area of the carrier's business operation unprotected.

The fact that the pickup truck is a relatively small vehicle, rather than a huge tractor truck, is irrelevant to the P.U.C.'s regulatory scheme. Nothing in the statutes or the P.U.C. decisions indicates that the Legislature was concerned only with the danger posed by mammoth trucks. Indeed, the insurance requirement was passed 46 years ago at a time when large tractor trucks were uncommon. Further, the requirement applies today to all businesses that transport property for hire, whatever the size of their vehicles.[8]

The language used by the general order supports the conclusion that all vehicles used in the carrier's business are included in the mandatory insurance coverage. The "service" performed by the carrier is transportation of property. The phrase "transportation of property" is broadly construed both by the Public Utilities Code and by P.U.C. decisions. It includes "every service in connection with or incidental to the transportation of property . . . ." (Pub. Util. Code, § 209.)

The P.U.C. has called this a "broad functional" definition (*Armored Transport Inc.* (1971) 72 Cal.P.U.C. 554, 557), which includes such ancillary services as packaging coins after transporting them, stringing pipe, disassembling and reassembling oil well derricks (*ibid.*), and preparing mobilehomes for transportation and setting them up for occupancy. (See *Central Home Movers* (1975) 78 Cal.P.U.C. 218, 224-225; *In re Application of White* (1976) 80 Cal.P.U.C. 386, 390; see also *Wigholm* (1951) 50 Cal.P.U.C. 816, 821.)[9]

---

[8]In support of its argument that the P.U.C. regulates only vehicles that are actually used to transport property, Transamerica referred to a P.U.C. form entitled "Report of Equipment to be Operated," and noted that the form specifically excluded "service trucks" from those vehicles which must be listed. The Samsons properly contended that the form was not competent evidence. First, the form contained a notation that it was revised in August 1976, 21 months after the accident which gave rise to this litigation. Therefore, the form was not relevant to a determination of P.U.C. procedures at the time of the accident. Second, Transamerica submitted no explanation of the purpose of the form. From the face of it, it is impossible to determine exactly what it is or when it is used. No conclusions can be drawn about the P.U.C. from it. Third, Transamerica submitted only the front page of the form. The record does not contain a copy of the reverse side, which apparently contained a list of codes that conceivably might place some qualifications on the conclusions Transamerica attempted to draw from the face of the form.

[9]Transamerica relies heavily on the definition of a "motor vehicle" in section 3510 of the Public Utilities Code as a "vehicle used for transportation of property over the public highways . . . ." The company argues that if the code is read in light of this definition, the endorsement and general order extend coverage only to vehicles actually used to transport property. However, in light of the broad definition of "transportation

"Transportation of property" clearly includes the services performed by the pickup truck in this case. The carrying of tools, spare parts and "wide load" signs, and the attempt by the driver to look for work and plan routes, are all ancillary services which are incidental to the transportation of property.

Since the pickup truck was used in the "transportation of property," it was "used in conducting the service [Vagle] performed." Therefore, it was included within the scope of the general order as well as the endorsement. Since both the general order and the endorsement were incorporated into the insurance policy, the Transamerica insurance policy covered Vagle's pickup truck.

The only prior case directly on point came to the same conclusion. In *Travelers Indem. Co.* v. *Colonial Ins. Co.* (1966) 242 Cal.App.2d 227, 240-241 [51 Cal.Rptr. 724], Justice Sullivan held that a forklift was covered by a policy containing a P.U.C. endorsement virtually identical to that attached to Vagle's policy.[10] The forklift obviously was not used to transport property over the highways, but rather for purposes incidental to that transportation, i.e., loading and unloading the carrier's trucks. The case stands for the proposition that the endorsement extends coverage to all vehicles used in a carrier's business, whether those vehicles actually are used to transport property or merely to assist in such transportation.

Transamerica attempts to distinguish *Travelers* on the ground that the underlying policy in that case included liability coverage for the forklift. However, the issue in *Travelers* was whether the endorsement, which contained a higher policy limit than the underlying policy, covered a particular service vehicle. Since the endorsement extended coverage to all vehicles for which "a permit . . . ha[d] been issued," the court in *Travelers* had to decide whether the carrier's permit included the forklift as well as vehicles which were used to haul property. The fact that the underlying policy covered the forklift was irrelevant to that decision.

---

of property" in Public Utilities Code section 209, any vehicle used to perform a service "incidental to the transportation of property" would be a "motor vehicle" under the code.

[10]*Travelers* was disapproved on other grounds in *Argonaut Ins. Co.* v. *Transport Indem. Co., supra,* 6 Cal.3d 496, 505, and in *State Farm Mut. Auto. Ins. Co.* v. *Jacober* (1973) 10 Cal.3d 193, 208 [110 Cal.Rptr. 1, 514 P.2d 953].

Two related cases, *California Packing Corp.* v. *Transport Indem. Co.* (1969) 275 Cal.App.2d 363, 370-371 [80 Cal.Rptr. 150], and *Giordano* v. *American Fidel. & Cas. Co.* (1950) 97 Cal.App.2d 309, 311-312 [217 P.2d 444], involved similar endorsements. The court found in both cases that all the vehicles owned by the carrier and used under the carrier's permit were covered by the endorsement, even though they were not covered by the underlying policy. The additional trucks were used to transport property and were not used as service vehicles. However, the rationales of these cases nonetheless support the conclusion that the endorsement includes coverage for all vehicles used in a carrier's business operations.

Transamerica argues that even if the pickup were covered while being used for business purposes, it was not covered while used for a personal errand. However, the endorsement and general order extended coverage to "vehicles." Nothing in either of those documents or in the underlying insurance policy excluded coverage for personal use of the covered vehicles. It is "well-established" in this state that exclusions in insurance policies must be "phrased in clear and unmistakable language." (*California State Auto. Assn. Inter-Ins. Bureau* v. *Warwick* (1976) 17 Cal. 3d 190, 194 [130 Cal.Rptr. 520, 550 P.2d 1056], citing *State Farm Mut. Auto. Ins. Co.* v. *Jacober, supra*, 10 Cal.3d 193, 201-202. See Ins. Code, § 11580.1, subd. (b)(3).) In the absence of an express exclusion, coverage extends to all uses of the vehicle.

Therefore, the trial court correctly ruled that the Transamerica insurance policy, as amended by the P.U.C. endorsement, provided coverage for Vagle's pickup truck at the time of this accident.

## III.

Transamerica next appeals from the trial court's summary judgment which obligated Transamerica to pay the entire $625,000 outstanding on the judgment in the Samson v. Vagle action. The company argues that even if coverage is found Transamerica should have an opportunity to litigate the amount of damages. Transamerica also contends it should be liable only up to its policy limits of $300,000.

Further, the insurance company contends that summary judgment was improper because a triable issue existed as to a material fact—the reasonableness of the settlement offer rejected by Transamerica.

The trial court ruled that Transamerica was bound by the damage findings of the prior action because it had refused to defend its insured. In addition, it held Transamerica liable for the entire amount of the judgment because it had wrongfully rejected a settlement offer that was reasonable as a matter of law.

It is well established in California that "an insurer that wrongfully refuses to defend is liable on the judgment against the insured. [Citation.]" (*Gray* v. *Zurich Insurance Co.* (1966) 65 Cal.2d 263, 279 [54 Cal.Rptr. 104, 419 P.2d 168]. Accord, *Metz* v. *Universal Underwriters Ins. Co.* (1973) 10 Cal.3d 45, 55 [109 Cal.Rptr. 698, 513 P.2d 922]; *Geddes & Smith, Inc.* v. *St. Paul Mercury* (1959) 51 Cal.2d 558, 561-562 [334 P.2d 881]; *Ford* v. *Providence Washington Ins. Co.* (1957) 151 Cal.App.2d 431, 436 [311 P.2d 930].)

When, in addition to refusing to defend, the insurer also rejects a reasonable settlement offer within policy limits, it may become obligated to pay more than its policy limits. "California authorities establish that an insurer who fails to accept a reasonable settlement offer within policy limits because it believes the policy does not provide coverage assumes the risk that it will be held liable for all damages resulting from such refusal, including damages in excess of applicable policy limits." (*Johansen* v. *California State Auto. Assn. Inter-Ins. Bureau* (1975) 15 Cal.3d 9, 12 [123 Cal.Rptr. 288, 538 P.2d 744].)

*Johansen* further held that "an insurer's 'good faith,' though erroneous, belief in noncoverage affords no defense to liability flowing from the insurer's refusal to accept a reasonable settlement offer." (*Id.*, at p. 16, fn. omitted.) If an insurer honestly believes that its policy does not provide coverage and, therefore, chooses to reject a reasonable settlement offer, it must bear the responsibility if coverage is found. As this court said over 20 years ago, explaining the doctrine of an insurer's liability for an excess judgment, "[a]n insurer who denies coverage does so at its own risk . . . ." (*Comunale* v. *Traders & General Ins. Co.* (1958) 50 Cal.2d 654, 660 [253 P.2d 495, 68 A.L.R.2d 883].)

Applying these well-settled rules of law to this case, the trial court found that Transamerica had wrongfully refused to defend Vagle, its insured, when its agent, Hebert, denied coverage in late March 1975. As a result of this denial of coverage, the trial court ruled that Transamerica was bound by the amount of the judgment against its insured, even though it was not a party to the action.

The trial court also found that Transamerica had rejected a reasonable settlement offer when it refused the plaintiffs' offer to settle in November 1975, three months after the judgment in *Samson v. Vagle* was entered. As a result of this wrongful settlement rejection, the court held Transamerica liable for the entire judgment against Vagle, including that part which exceeded the limits of Vagle's Transamerica insurance policy.

■ Transamerica attacks the trial court's ruling on several grounds. First, it argues that it had no notice of the trial date of the action against Vagle and was never asked to defend him. Transamerica argues that it cannot be bound by a judgment reached in an action of which it had no notice.

The "general rule" is that an insurer is not bound by a judgment unless it had notice of the pendency of the action. (*Clemmer v. Hartford Insurance Co.* (1978) 22 Cal.3d 865, 884 [151 Cal.Rptr. 285, 587 P.2d 1098], citing *Ford v. Providence Washington Ins. Co., supra,* 151 Cal.App.2d 431, 436, 437.) By the terms of the policy between Vagle and Transamerica, such notice would include written notice of the accident and copies of all legal papers served on him in the lawsuit. However, if an insurer denies coverage to the insured, the insured's contractual obligation to notify the insurer ceases. (*Drinnon v. Oliver* (1972) 24 Cal.App.3d 571, 580 [101 Cal.Rptr. 120].) The insured is relieved of his obligation to inform the insurance company of the service of summons or the date of trial of the action. (*Id.,* at pp. 579-581; see also *Clemmer, supra,* 22 Cal.3d 865, 881-885.)

Transamerica acknowledges that in late March 1975 Hebert, a Transamerica agent, told Vagle that the Transamerica insurance policy did not cover the pickup truck. Transamerica attempts to belittle this denial of coverage, arguing that it was informal and made directly to the insured, not to his attorney. However, Transamerica cites no authority for its suggestion that a denial of coverage must be formal or be made to an attorney. The denial of coverage was made, and the insured thereby relieved of his obligation to notify the insurance company of the progress of the action against him.[11] Transamerica is not relieved from liability for the judgment against its insured because of his failure to follow the notice requirements of the insurance policy.

---

[11]This conclusion appears to work no injustice. The denial of coverage was repeated in numerous Transamerica memoranda, and apparently reflected Transamerica policy. At no time did Transamerica attempt to retract the denial of coverage or investigate

Transamerica's claim of lack of notice is even less convincing in light of the company's admission, in its appellate briefs, that it had *actual notice* of the accident and the lawsuit, although not of the trial date. Indeed, it would be difficult to deny such notice, since the record contains written memoranda indicating that Transamerica officials were aware of the lawsuit, had notice of Transamerica's potential liability, and chose to stay out of the lawsuit. Transamerica is bound by the result of that lawsuit as fully as if it had participated in it from the start.

Transamerica also acknowledges that it had notice of the judgment in the Samson v. Vagle action three months after it was entered, since the Samsons sent a copy of the judgment along with their offer to settle. Transamerica did not reply to that offer, and made no attempt at that time to avoid liability by moving to set aside the judgment on the grounds that it was obtained through fraud or mistake.

As this court said in *Clemmer v. Hartford Insurance Co., supra*, 22 Cal.3d 865, 886, the insurer "knew or should have known that judgment against its insured would form the basis for a later claim against it . . . . Instead of protecting itself . . . it chose to remain silent, resting on its claim of noncoverage. Having failed to pursue remedies thus available to it, it cannot now claim prejudice or lack of opportunity to litigate damages." (See also *id.*, at pp. 884-886; *Villarruel v. Arreola* (1977) 66 Cal.App.3d 309 [136 Cal.Rptr. 19]; 5 Witkin, Cal. Procedure (2d ed. 1971) §§ 175-198, pp. 3744-3770.)

■ Transamerica argues that it merely denied coverage, but did not refuse to defend the lawsuit, since Vagle never demanded a defense. The same argument was rejected by the Court of Appeal in *Drinnon v. Oliver, supra*, as "sheer sophistry." (24 Cal.App.3d 571, 579.) The insurance company's obligation to defend arises when it is informed of the accident and learns of even the potential for liability under its policy. (*Gray v. Zurich Insurance Co., supra*, 65 Cal.2d 263, 276-277; *State Farm Mut. Auto. Ins. Co. v. Allstate Ins. Co.* (1970) 9 Cal.App.3d 508, 526-527 [88 Cal.Rptr. 246].)

---

the possibility that the policy might cover the accident. Despite two internal memos suggesting that the matter be referred to the legal department, no legal analysis was undertaken. As this court said in a similar case, the insurer has not demonstrated any prejudice as a result of the lack of notice of the trial date, since it has not shown that it would have defended the lawsuit if it had had such notice. (*Clemmer v. Hartford Insurance Co., supra*, 22 Cal.3d 865, 883.)

The mere fact that an insurance company established a reserve fund for defense of a case, as Transamerica did in this case, has been held to be an indication that the company was aware of its responsibility to defend its insured. (*Miller* v. *Elite Ins. Co.* (1980) 100 Cal.App.3d 739, 753 [161 Cal.Rptr. 322].) Having breached the duty to defend, Transamerica is bound by the resulting judgment against its insured.

■ Transamerica's next attack on the trial court summary judgment is a claim that the entire procedure leading up to this action demonstrates bad faith and collusion by the insured (Vagle), the plaintiffs (the Samsons), the coinsurers (State Farm), and the attorneys for all the parties.[12] Transamerica's claim boils down to a charge that the parties intentionally "set up" the excess-of-policy judgment against it. The claim of collusion and bad faith seems to focus on the fact that early in the lawsuit—in June of 1975—Vagle and the plaintiffs agreed to a settlement plan whereby the Samsons signed a covenant not to execute against Vagle in return for Vagle's agreement to assign his cause of action against Transamerica to them and State Farm's payment of its $100,000 policy limit. Transamerica was not informed of this settlement agreement.

The problem with this contention is that Transamerica has not shown that any of the parties (except Transamerica itself) breached any duty or in any way acted improperly in the conduct of this lawsuit. It is true that the insurance contract imposes a duty of good faith and fair dealing on the insured, as well as the insurer. (*Johansen* v. *California State Auto. Assn. Inter-Ins. Bureau, supra*, 15 Cal.3d 9, 20.) However, as discussed above, Vagle's duty to notify Transamerica of the lawsuit ceased when the insurer denied coverage. (See *Drinnon* v. *Oliver, supra*, 24 Cal.App.3d 571, 580.)

In addition, this court and the Court of Appeal have frequently held that an insured breaches no duty to the insurance company when he assigns his rights against the company to the injured plaintiffs in return for a covenant not to execute. "[W]here the insurer has repudiated its obligation to defend[,] a defendant in the absence of fraud may, without forfeiture of his right to indemnity, settle with the plaintiff upon the best terms possible, taking a covenant not to execute." (*Zander* v. *Texaco, Inc.* (1968) 259 Cal.App.2d 793, 802 [66 Cal.Rptr. 561]; accord,

---

[12]The demurrers of State Farm and its attorneys were sustained by the trial court and are not challenged in this appeal.

*Johansen, supra*, 15 Cal.3d 9, 14, fn. 3; *Comunale, supra*, 50 Cal.2d 654, 661-662.) When the insurer "exposes its policyholder to the sharp thrust of personal liability" by breaching its obligations, the insured "need not indulge in financial masochism . . . ." (*Critz* v. *Farmers Ins. Group* (1964) 230 Cal.App.2d 788, 801 [41 Cal.Rptr. 401, 12 A.L.R. 3d 1142].)

In *Critz, supra*, the defendant insurance company rejected a settlement offer soon after the accident occurred. The insured, without informing the insurance company, immediately assigned all his rights against the company to the injured plaintiff, receiving in return a covenant not to execute against his assets. The Court of Appeal found this procedure permissible. (*Id.*, at pp. 801-802.)

In this case as well, there was nothing fraudulent or collusive about Vagle's assignment of his cause of action to the Samsons. As in *Critz*, "[b]y executing the assignment, he attempt[ed] only to shield himself from the danger to which the company . . . exposed him." (*Id.*, at p. 801.) He acted in his own self-interest after Transamerica's denial of coverage, as he had every right to do. Any resulting damage to Transamerica was caused not by Vagle's supposed misconduct but by Transamerica's own intransigence.

Transamerica also claims collusion on the part of State Farm and the plaintiffs because of their failure to inform Transamerica of the settlement agreement or the date of the trial. However, neither a coinsurer nor the plaintiffs in a suit against an insured defendant have a duty to the insurer, in the absence of any positive steps that might lead the insurer to expect notice from them. (*Drinnon* v. *Oliver, supra*, 24 Cal.App.3d 571, 581-583. See Mallen, *Responsibility of Defense Counsel to "Other" Insurers* (1981) 48 Ins. Counsel J. 132, 133 [no duty to other insurers unless counsel undertakes to advise or assist, thereby assuming "a duty which would not otherwise exist."].) Neither State Farm nor the Samsons in any way undertook a duty toward Transamerica in this action.

The case relied on by Transamerica, *Villarruel* v. *Arreola, supra*, 66 Cal.App.3d 309, is clearly distinguishable. In that case, the plaintiff's attorney told the defendant's insurer that the action against the insured would be taken off calendar and a settlement would be arranged. Instead, the plaintiff proceeded with the action and obtained a judgment in an amount twice that pleaded for in the complaint. The court held

that the insurer was not bound by the judgment entered contrary to the agreement. (*Id.*, at p. 317.) In the instant case, the attorneys for State Farm and for the Samsons in no way altered their "arm's length" relationships with Transamerica. (*Critz, supra*, 230 Cal.App.3d 788, 797.) Thus, they had no obligation to inform Transamerica of the lawsuit against its insured.[13]

■ Transamerica next charges that Vagle, the Samsons and State Farm acted in collusion to inflate the size of the judgment against Vagle, in an attempt to create an excess-of-policy action against Transamerica. Transamerica points to the fact that Vagle presented no defense at the trial of the Samson v. Vagle action and did not cross-examine the plaintiffs' witnesses. Vagle, however, had no obligation to present what he may have thought was a useless defense. He could not deny liability, having already pleaded guilty to a charge of vehicular manslaughter arising out of the accident.

Transamerica points to no evidence to support its claim that the award of $725,000 was unreasonably high and resulted from the collusion between the insured and the opposing parties. The only evidence Transamerica presented was a statement by a State Farm attorney, Gay, that the Samsons' attorney, Weaver, evaluated the case at $250,000. Gay later asserted that he was mistaken in attributing this figure to Weaver. (See fn. 4, *ante*, at p. 228.) Nothing in the record sets forth a comparison between this judgment and damage awards in similar cases. The calculations of the expert, who testified as to the value of the action for the death of Milagrosa Samson, were never challenged. Thus, the trial court had no reason to question the validity of the $725,000 figure.

In the absence of any additional evidence which might question the reasonableness of the damages award, this court must agree with the trial court's conclusion that Transamerica has not raised a triable issue of fact as to the allegedly collusive nature of the damages judgment.

■ Transamerica's final contention is that summary judgment was improper because the issue as to whether it wrongfully rejected a rea-

---

[13]Neither Vagle nor the Samsons had an obligation to notify Transamerica of the settlement agreement or the trial date. However, such notification would have been the better practice. If full notification had been given it would have decisively refuted the claims of collusion and bad faith and would have significantly decreased the time and expense involved in this complex litigation.

sonable settlement offer must be decided by a jury. It is true that the reasonableness of a rejected settlement offer is often an issue of fact to be determined by a jury. (*Critz, supra*, 230 Cal.App.2d 788, 796-797; *Brown v. Guarantee Ins. Co.* (1957) 155 Cal.App.2d 679, 689 [319 P.2d 69].) However, reasonableness in this context was narrowly defined by this court in *Johansen*. "[*T*]*he only permissible consideration in evaluating the reasonableness of the settlement offer becomes whether*, in light of the victim's injuries and the probable liability of the insured, *the ultimate judgment is likely to exceed the amount of the settlement offer*." (*Johansen, supra*, 15 Cal.3d 9, 16. Italics added.) ▪ A good faith belief in noncoverage is not relevant to a determination of the reasonableness of a settlement offer. (*Id.*, at pp. 15-16.)

▪ In this case, the judgment against the insured had already been entered, and concededly exceeded the amount of the settlement offer. Thus, as a matter of law, the settlement offer was reasonable and was wrongfully rejected by Transamerica.[14]

## IV.

The trial court correctly ruled that Transamerica is bound by the judgment against its insured in the Samson v. Vagle action. Transamerica is liable for the entire amount of the judgment because of its wrongful failure to accept a settlement offer within policy limits.

The trial court order granting the motions for summary judgment on the complaint and the cross-complaint is affirmed.

Tobriner, J., Mosk, J., Richardson, J., Newman, J., Kaus, J., and Broussard, J., concurred.

---

[14]This is not to say that an insurance company, faced with an offer to settle within its policy limits after a larger judgment has already been entered, has no choice but to accept the offer. However, an insurance company that decides to reject such an offer does so at its own risk.