Ronald F. SLAYMAKER and Vera Slaymaker, husband and wife, Appellants,

v.

Thomas PETERKIN, Appellee.

Thomas PETERKIN, Cross-Appellant,

v.

Ronald F. SLAYMAKER and Vera Slaymaker, husband and wife, Cross-Appellees.

Nos. 1958, 1965.

Supreme Court of Alaska.

Feb. 4, 1974.

Karl S. Johnstone, Anchorage, for appellants and cross-appellees.

Kenneth P. Jacobus and Jerry E. Melcher of Hughes, Thorsness, Lowe, Gantz & Clark, Anchorage, for appellee and cross-appellant.

Before RABINOWITZ, C. J., and CONNOR, ERWIN, BOOCHEVER and FITZGERALD, JJ.

## OPINION

FITZGERALD, Justice.

These appeals are taken from a summary judgment entered by the superior court in favor of Thomas Peterkin against Ronald F. and Vera Slaymaker.

On February 15, 1971, Ronald F. Slaymaker entered into a written agreement to buy a tract of land from George Huff. Slaymaker promised to pay Huff $135,000 on terms which included $35,000 in cash at the time of closing, together with an unsecured note of $100,000 for the balance, made payable at $35,000 per annum beginning June 1, 1972 at 9% interest. The agreement was contingent until March 23, 1971, when Slaymaker and Huff initialed their final approval to the contract. The transaction was closed on April 29, 1971, at which time the cash payment was made and a note was executed by Vera and Ronald Slaymaker. A deed was prepared and the documents were placed in escrow.

Huff assigned the proceeds of the note to Thomas Peterkin in July of 1971. In early June of 1972, Peterkin requested payment by the Slaymakers of the first installment due on the note. The Slaymakers did not make the payment for reasons now in dispute. The Slaymakers' initial response to Peterkin apparently was that they were not sure who held the note or who was entitled to the payment. According to Peterkin, the Slaymakers were unwilling to pay the installment and requested a thirty-day grace period which Peterkin reluctantly granted. Other meetings followed between Peterkin and the Slaymakers concerning payment of the installment due on the note. Peterkin contends that he steadfastly pressed his demand for payment on the note; he obtained a partial payment of $15,000. Finally, after consulting with his attorneys, he brought suit on August 29, 1972. Peterkin asked for judgment for the entire sum owing on the note, some $97,000, under the note's acceleration clause. This clause provided that "[i]n the event of default . . . the entire

amount shall become due and payable forthwith without demand or notice at the option of the holder. . . ."

The Slaymakers answered Peterkin by claiming that he was estopped from applying the acceleration provision in the note and that the instrument itself was usurious.

The superior court entered summary judgment [1] in Peterkin's favor for the full remaining balance of the note and ruled that the note was not usurious. The Slaymakers now appeal from the summary judgment, and Peterkin appeals from the award of attorneys' fees, contending the award is inadequate.

THE USURY ISSUE:

When Ronald Slaymaker and George Huff entered into the final written agreement of purchase on March 23, 1971, which agreement called for Slaymaker to execute a $100,000 unsecured promissory note to carry interest at 9% per annum, the legal rate of interest was established by the Commissioner of the Department of Revenue at 9¾%. On April 1, 1971, the legal rate of interest became 8¾%.[2] On April 29, 1971, Slaymaker and Huff "closed" the land transaction pursuant to their March 23rd written agreement and at that time the promissory note was made and executed. There was apparently some concern about a possible usury problem resulting from the intervening reduction of the legal rate of interest, and the note was backdated to March 30, 1971.

The Slaymakers now contend that the note is usurious since it provides for 9% interest and was executed when the legal rate of interest was 8¾%. Peterkin argues that the note was executed to satisfy a pre-existing loan contract and that the date of the contract is the critical date for determining whether the note is usurious. The Slaymakers reply, however, that the written agreement was not a "loan contract or commitment" within the terms of the statute. They contend that they were not bound to pay the 9% interest rate until April, when they signed the note, because an earnest money agreement is not an enforceable agreement to buy and sell land but rather an option contract allowing the earnest money deposit to be forfeited if the buyer repudiates. No authorities are furnished to us to support this view.[3]

Additionally the Slaymakers contend that the written agreement is too indefinite to be enforced and therefore is not a "loan contract or commitment." The claim is made that the terms of the contract could have been altered by the parties, that the date from which interest was to run is not stated, that the parties to the proposed deed are not stated, and that the attorneys who were to examine the final agreement had not been selected.

The parties to a contract may, of course, alter its terms, unless intervening rights are involved. The uncertainties as to the starting of interest accumulation and the parties to the deed could easily have been resolved by a court in order to enable the parties to fulfill their mutual expectations.[4] In the absence of any evi-

---

1. Civil Rule 56 allows the court to enter judgment where the pleadings, depositions and admissions on file, together with affidavits, show that there is no genuine issue as to any material fact and that a party is entitled to judgment as a matter of law.

2. The maximum interest rate for loan contracts changed pursuant to what was then AS 45.45.010(b):

"Until February 15, 1972 during any calendar quarter no interest may be charged by express agreement of the parties in a loan contract or commitment which is more than four percentage points above the federal reserve discount rate for the 12th Federal Reserve District that prevailed on the first

day of the month preceding the commencement of that calendar quarter. . . ."
This concept of a floating maximum interest rate has been retained in the present version of AS 45.45.010(b).

3. The Slaymakers cite Mortenson v. Financial Growth Inc., 23 Utah 2d 54, 456 P.2d 181, 184 (1969), but this case merely upholds the right of the seller to elect to retain the earnest money deposit. It does not purport to hold that the seller could not enforce the agreement to buy and sell if he so elected.

4. See Rego v. Decker, 482 P.2d 834 (Alaska 1971) and, in the area of personalty transactions, AS 45.05.056.

dence that the parties intended to await legal advice before committing themselves, we see the failure to name attorneys as inconsequential. In summary, a close reading of the earnest money agreement convinces us that it is sufficiently definite to be an enforceable agreement to buy land on the terms negotiated.[5]

Clearly, when the statute contemplates quarterly changes in the legal rate of interest, the necessities of commerce, and in particular real estate financing, require that a loan commitment which is legal when agreed to shall remain legal even though the rate of interest changes before completion of the transaction. To hold otherwise would cause commercial uncertainty and unnecessarily upset valid contractual agreements or transactions.

We conclude then that the commitment to make and execute the note was made at a time when the maximum legal rate of interest was in excess of 9%. The trial court correctly ruled that the note was not usurious.

## THE ACCELERATION ISSUE:

The affidavits and depositions before the trial court established that Peterkin requested payment of the first installment of $35,000 in June of 1972. The Slaymakers expressed a desire to satisfy the note, wholly or in part, by a trade of certain tracts of land in Kanai, Alaska. They allege that Peterkin agreed to look at the property and to inform the Slaymakers if their proposal would be satisfactory. The Slaymakers sent Peterkin some land plats and subsequently Peterkin looked at the land. Nothing further was heard from Peterkin, according to the Slaymakers, until August 29, 1972, when the action on the note was filed in superior court with notice of acceleration. The Slaymakers in their affidavits say that they communicated with Peterkin to protest his bad faith and to of-

fer immediate payment in cash of the overdue installment. According to the Slaymakers, Peterkin responded by referring them to his attorney.

Peterkin's deposition testimony is a good deal different. He states that he continued to press his demand for the overdue installment, and that although he agreed to look at the Kenai land, any transaction would be completely independent and have no bearing on payment of the installment due. It is clear that this conflict in the evidence could not have properly been resolved by summary judgment. The credibility and force of the evidence can only be reliably determined at a trial.

The trial court apparently granted summary judgment on the theory the Slaymakers had to give consideration for any promise to forbear collection of the overdue installment. But promissory estoppel often applies to agreements which are otherwise voidable for want of consideration. A precise formulation of the doctrine is found in the Restatement of Contracts § 90 (1932):

> "A promise which the promisor should reasonably expect to induce action or forbearance of a definite and substantial character on the part of the promisee and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise."

In this case the Slaymakers have presented evidence that they failed to make the installment payment due on the note, although willing and able to do so if requested, upon Peterkin's promise to forbear further demand for payment until he had communicated his decision on their proposal for a land trade. They also allege that they offered to pay the overdue installment when they learned of the suit and that this offer was refused. These facts, if established at trial, would afford the Slaymak-

---

5. One clause provides "1/We agree to purchase and pay for the above described property on the terms and conditions herein stated. . . . I/We understand that this is a legally binding contract."

ers a valid defense to Peterkin's attempt to accelerate collection of the note by filing the lawsuit.

There may be other issues relating to continued or subsequent defaults by the Slaymakers occurring after the filing of the action, but these are not before us; we are presently concerned only with those issues relating to this summary judgment. The remaining issues regarding default await further proceedings in the trial court. Nor is it necessary for us now to decide whether the Slaymakers' other asserted defenses are valid[6] or to rule up-Peterkin's appeal of the attorney's fees awarded by the trial court.

We vacate the summary judgment and remand this case for further proceedings.

---

6. The Slaymakers urged below and here that Peterkin did not prove that he was a "holder" of the note at the time of the attempted acceleration, because one must take an instrument by endorsement rather than mere assignment, to be a "holder" under AS 45.05.-290. Without deciding this issue, we note that AS 45.05.290 states that "Transfer of an instrument vests in the transferee such rights as the transferor has [there] in . . . ."