Theodore B. ULAND, Marylou Uland, Defendants-Appellants,

v.

The NATIONAL CITY BANK OF EVANSVILLE, Plaintiff-Appellee.

No. 1–782A198.

Court of Appeals of Indiana, First District.

April 19, 1983.

Rehearing Denied June 10, 1983.

---

6. Final Instruction No. 20.

Timothy R. Dodd, Evansville, for defendants-appellants.

Alan N. Shovers, Patrick A. Shoulders, Marilyn R. Ratliff, Kahn, Dees, Donovan & Kahn, Evansville, for plaintiff-appellee.

NEAL, Judge.

## STATEMENT OF THE CASE

Defendants-appellants Theodore B. Uland (Ted) and Marylou Uland (Marylou) appeal an adverse judgment on a note, rendered against them jointly and severally by the Vanderburg Superior Court in favor of The National City Bank of Evansville (Bank), the plaintiff-appellee.

We affirm.

ISSUES

The issues presented for review are as follows:

I. Is the Bank's claim barred by the ten year statute of limitations; and

II. Is the evidence sufficient to sustain the decision of the trial court against Marylou's defense of *non est factum* regarding a guaranty agreement purportedly executed by her.

For clarity the statement of facts relating to each issue will be stated in the discussion of that issue.

## DISCUSSION AND DECISION

*Issue I. Statute of limitations*

▮ On January 19, 1968, Ted executed a note to the Bank for the sum of $83,520. The note contained an acceleration clause which stated that upon default "this note shall, at the option of the holder hereof, immediately become due and payable." The note was payable in 36 monthly installments of $2,320 each commencing February 25, 1968. The proceeds of the note were for the refinancing of Ted's oil well drilling business and other enterprises, and for machinery. The note was secured by a security agreement on 14 pieces of equipment. The first payment was made when due, but the payments then became delinquent and remained delinquent throughout, although substantial payments continued to be made. On May 16, 1969, the Bank sent Ted a letter, the contents of which are as follows:

"Your account is seriously in default and we cannot continue to carry your obligation in this manner.

The March 25 installment in the total amount of $2,348.25 is past due together with the April 25 installment in like amount. We are surprised and concerned that you have neglected this obligation. We cannot under any conditions continue to carry the obligation in default and in view of your continued neglect, we must ask that you make immediate arrangements to liquidate the full balance of $62,645 within one week from this date. We are sorry that this action is necessary; however, our Directors Credit Committee

does not wish us to continue on this basis."

Thereafter, according to Ted's own testimony at trial the Bank relented.

"A. No, he [Bert Cottrell, a Bank officer] said that he went to the loan committee, I think after that, and talked them into agreeing to reinstate it if I would catch up on the bank loans. I told him I would try to.

Q. So they were still . . .

A. I tried to get reinstated with them. I didn't have the money to catch up with it, so . . ."

On May 27, 1969, Cottrell wrote Ted saying:

"After discussing your account with our Credit Committee they have agreed to continue the financing of this debt.

The proviso they make is that all future payments must be received by us on maturity date without exception. We are happy to tell you this good news."

Nevertheless, on June 25, 1969, another letter was sent by Cottrell to Ted informing him that the payment due on that date was not made and,

". . . unless we receive the June remittance by return mail and future payments promptly on maturity date, we will have to ask you to make other arrangements for the refinancing of your obligation."

Payments were not kept up, and on December 15, 1969, further correspondence was had from Cottrell to Ted.

"I have just returned from a meeting with our Directors Credit Committee and they are insisting that immediate action be taken on your account.

Unless you communicate with us immediately, we will be forced to pursue legal remedies recommended by the Committee."

The record does not disclose any further action relating to a calling of the loan. Throughout 1968, 1969, and 1970 payments in irregular amounts and at irregular times were received by the Bank, and by January

25, 1971, the balance due was $31,945, at which point the Bank wrote off the note as a bad debt. The evidence is unsatisfactory regarding the sources of the payments. However, it is evident that many of the payments were from oil lease receipts which had been assigned to the Bank as security, insurance paid to the Bank as loss payee on damaged equipment, and the liquidation of collateral. After January 25, 1971, there was a further liquidation of collateral which reduced the balance to $28,085. The last application of payment from any source was in September, 1972. Suit was filed on January 23, 1980.

The parties agree that the case is governed by the ten year statute of limitations contained in Ind.Code 34–1–2–2. The sole question is the date on which the statute commenced to run. Ulands contend that it commenced to run on March 25, 1968 (the date the second payment became delinquent), May 16, 1969, or at the latest December 15, 1969, when, as they contend, the Bank called the loan. They claim that the May 16 and December 15 letters were unequivocal demands for immediate payment, exercising the option to accelerate payments. The Bank claims that the statute commenced to run at maturity of the loan, namely January 25, 1971. Both Ulands and the Bank rely totally on *Cowan v. Murphy,* (1975) 165 Ind.App. 566, 333 N.E.2d 802.

*Cowan* draws a distinction between an acceleration clause which is optional with the obligee, and one which is mandatory. The *Cowan* case was concerned with a mandatory acceleration clause and held that the default triggered its operation according to the terms of the note regardless of the intention of the obligee, and the principal balance became due for all purposes. Therefore, the statute of limitations began to run at the time of the initial default. The case also held that the acceptance of late payments after the default did not operate as a waiver of the mandatory acceleration clause because the whole debt had already become due, and a partial performance of that obligation by part payment could not have had the effect of postponing maturity. Dicta in that case suggests the result here.

"Frieda contends that her acceptance of the late payments in February and April of 1961 operated as a waiver of acceleration clause, and thus no cause of action on the note itself accrued until the whole note had become due at the end of the ten year term. *Had the acceleration clause been merely optional, as they usually are, her contention would be correct. See Huston v. Fatka* (1903), 30 Ind.App. 693, 66 N.E. 74." (Emphasis added.)

*Id.* 165 Ind.App. at 572, 333 N.E.2d 802. *Cowan* cites *McFarland v. Christoff,* (1950) 120 Ind.App. 416, 92 N.E.2d 555, which in turn relied upon *Buchanan et al. v. The Berkshire Life Insurance Company,* (1884) 96 Ind. 510.

*Buchanan* involved an optional acceleration clause. The court set forth the rights of the parties and suggested that where an optional clause was involved, the consensual arrangements of the parties may be controlling.

"This provision is not by way of penalty or forfeiture, but is an agreement between the parties as to the time when the whole debt should become due and collectible. It was thus to become due, not upon notice to the mortgagor or others, but at the option, the choice, of the mortgagee. At what time or in what manner the option should be exercised was not provided for; that was left entirely with the mortgagee. It is one of the cases, we think, in which the institution of proceedings to foreclose the mortgage sufficiently shows the election to treat the whole debt as due and collectible.... When the whole amount became due by the failure to pay as agreed upon, it was not in the power of appellants [mortgagors] to make it otherwise, *except with the consent of the mortgagee.*" (Emphasis added.)

*Id.* 96 Ind. at 520–21.

Cases from other jurisdictions state that after the option to accelerate has been exercised it is not within the maker's power unilaterally to restore the note to good

standing by performance, as the rights of the parties are the same as if the note by its terms became due mandatorily. *Wolfey v. Wooten,* (1927) 220 Mo.App. 668, 293 S.W. 73; 10 C.J.S. *Bills and Notes* § 251. *See generally, Stephens v. The Huntington and Drovertown Building, Loan and Savings Association,* (1881) 76 Ind. 109. However, the obligee must do some positive act to indicate the exercise of the option, and until that time the maker of the note may terminate that right by the tender of performance. *Toomey v. Cammack,* (1975) D.C. App., 345 A.2d 453; *Santini v. Fritkin,* (1965) 240 Md. 542, 214 A.2d 578. Accordingly the holder may lose or waive his right by acceptance of payments after default. *Colorado Kenworth Corporation v. Whitworth,* (1960) 144 Colo. 541, 357 P.2d 626; *Slaymaker v. Peterkin,* (1974) Alaska, 518 P.2d 763. Further, as relevant here, the fact that a holder has exercised his option to accelerate all payments does not render his actions irrevocable with respect to his right to waive the exercise of the option, at least where the maker does not object. *Denbina v. City of Hurst,* (1974) Tex.Civ. App., 516 S.W.2d 460; *Dallas Joint Stock Land Bank v. King,* (1942) Tex.Civ.App., 167 S.W.2d 245. *See Buchanan, supra.*

The letter of May 16, 1969, standing alone would have amounted to a clear exercise of the option to accelerate payments, and if followed by positive action on the part of the Bank, the statute of limitations would have begun to run as of that date. However, the record clearly shows subsequent agreements of the parties to reinstate the note. Ulands have not cited authority, and we have found none, which holds that the parties may not by agreement revoke an initial exercise of the option. Therefore, under the reasoning of *Cowan,* the statute of limitations did not commence to run here until the note was due, and the case was timely filed.

*Issue II. Non est factum*

Any liability of Marylou, insomuch as she was not a signator on the note, was derived from a guaranty agreement dated December 2, 1966, purportedly executed by her.

She filed a *non est factum* defense under Ind.Rules of Procedure, Trial Rule 9.2(B), (D) and (H). Both she and Ted testified that she did not sign the guaranty, and Ted acknowledged that he did. Both Ted and Marylou testified that he had no authority to sign her name to the document. The Bank seeks to impose liability under one or the other of the following theories: (1) Marylou signed the guaranty, or (2) Ted had implied authority from Marylou to sign it. The trial court made a general finding in favor of the Bank, and there is no indication in the record of the theory on which the court proceeded.

 A general judgment is presumed to be based upon findings supported by the evidence, and if the action of the trial court can be sustained upon any legal theory it must be affirmed. *English Coal Co., Inc. v. Durcholz,* (1981) Ind.App., 422 N.E.2d 302. This court does not weigh the evidence or adjudge the credibility of the witnesses. *Travis v. Hall,* (1982) Ind.App., 431 N.E.2d 519.

 A wife is not liable on contracts entered into by her husband, and is not liable for contracts made in her name by her husband without authority to act as her agent. *Zack v. Smith,* (1982) Ind.App., 429 N.E.2d 983. While marriage alone does not create an agency relationship, marriage is a factor to be considered to determine if an agency relationship exists. *Moehlenkamp v. Shatz,* (1979) Ind.App., 396 N.E.2d 433. One spouse may constitute the other spouse as agent either expressly or impliedly, but if impliedly, it must be by her conduct, and not merely from her position as a spouse. *Moehlenkamp, supra.* Examination of the record here discloses no knowledge or course of dealings on Marylou's part from which agency can be implied.

 The evidence does not disclose that any witness, expert or lay, testified that the signature on the agreement was Marylou's. The sole evidence before the court as to the genuineness of the signature were standards or exemplars of her signature in the form of checks admittedly

signed by Marylou and entered into evidence by her testimony in her case-in-chief. The sole remaining question is whether the admittedly authentic standard available to the court to compare with the disputed signature on the guaranty is alone sufficient evidence to sustain the decision of the trial court without the aid of the testimony of witnesses. Under T.R. 9.2(D) the Bank bears the burden of proof.

Ind.Code 34–3–6–1, enacted in 1913, reads as follows:

> "In any proceeding before a court or judicial officer of the state of Indiana where the genuineness of the handwriting of any person may be involved, any admitted or proved handwriting of such person shall be competent evidence as a basis for comparison by witnesses, or by the jury, court or officer conducting such proceedings, to prove or disprove such genuineness."

This statute is largely an enactment of the common law. The cases prior to the statute held that where standards admitted to be genuine are in evidence, the trier, with or without the aid of witnesses, expert or lay, can compare the signatures. *See Shorb v. Kinzie,* (1885) 100 Ind. 429; *Burdick v. Hunt,* (1873) 43 Ind. 381; *Chance v. The Indianapolis and Westfield Gravel Road Company,* (1870) 32 Ind. 472; *Ashwell v. Miller,* (1913) 54 Ind.App. 381, 103 N.E. 37. *Compare* 80 A.L.R.2d 272. The appellate tribunal may not draw its own conclusions from the documents as that is a province of the trial court. *Burdick, supra; Snider v. Preachers Aid Society,* (1942) 111 Ind.App. 410, 41 N.E.2d 665. In *Snider* the court upheld the trial court's finding that the signature was genuine; apparently this finding was based upon the standard alone. The *Snider* court applied Ind.Code 34–3–6–1 and affirmed the judgment even though numerous witnesses had testified that the signature was not authentic. We conclude that the trial court could have compared the signatures and found the one on the guaranty to be Marylou's.

Under these authorities we are of the opinion that the evidence is sufficient to support the judgment.

For the above reasons this cause is affirmed.

Affirmed.

ROBERTSON, P.J., and YOUNG, P.J. (participating by designation), concur.