R.W. BECK & ASSOC., et al., Plaintiffs,

v.

CITY AND BOROUGH OF SITKA, Defendant,

and

PROVIDENCE WASHINGTON INSURANCE COMPANY, Defendant–Appellant,

v.

WESTERN WORLD INSURANCE COMPANY, Defendant–Appellee.

ADMIRAL INSURANCE COMPANY, et al., Plaintiffs–Appellees,

v.

ESTATE OF McKinley NICHOLAS, et al., Defendants.

R.W. BECK & ASSOC., et al., Plaintiffs,

v.

CITY AND BOROUGH OF SITKA, Defendant–Appellant,

and

PROVIDENCE WASHINGTON INSURANCE COMPANY, Defendant,

v.

WESTERN WORLD INSURANCE COMPANY, Defendant–Appellee.

ADMIRAL INSURANCE COMPANY, et al., Plaintiffs–Appellees,

v.

ESTATE OF McKinley NICHOLAS, et al., Defendants.

Nos. 92–36558, 92–36627.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Jan. 31, 1994.

Decided June 28, 1994.

Meredith A. Ahearn, Hagans, Brown, Gibbs & Moran, Robert L. Eastaugh, Delaney, Wiles, Hayes, Reitman & Brubaker, Inc., Anchorage, AK, for defendants-appellants.

Earl M. Sutherland, Hughes Thorsness Gantz Powell & Brundin, Anchorage, AK, for defendants-appellees.

James B. Wright, Timothy M. Lynch, Anchorage, AK, for plaintiffs-appellees.

Before: WRIGHT, REAVLEY * and LEAVY, Circuit Judges.

Opinion by Judge REAVLEY.

REAVLEY, Circuit Judge:

These consolidated appeals arise from an insurance dispute among the City and Borough of Sitka, Alaska (Sitka) and three insurance companies: Western World Insurance Company (Western), Providence Washington Insurance Company (Providence), and Admiral Insurance Company (Admiral). The district court disposed of the various coverage disputes by summary judgment. We reverse the judgment to the extent that it absolves Western of excess liability coverage.

## FACTUAL AND PROCEDURAL BACKGROUND

Sitka owned and operated Blue Lake Dam. It hired R.W. Beck & Associates (Beck) and Alaska Aquatic Dive Center, Inc. (Aquatic) to perform certain services on the dam. On April 20, 1983 McKinley Nicholas, the president of Aquatic, died while making an underwater inspection of the dam. At the time, Sitka had a primary insurance policy with Providence and an excess liability policy with Western. Sitka was also named as an additional insured on an Admiral primary policy issued to Aquatic. Nicholas' widow and estate (collectively "the estate") brought a

* Honorable Thomas M. Reavley, Senior United States Circuit Judge for the United States Court of Appeals, Fifth Circuit, sitting by designation.

wrongful death suit in Alaska state court against Beck and Sitka, and obtained a substantial judgment against both.

Beck brought suit in federal court against Sitka to pursue a claim for contractual indemnity for the losses occasioned by the death of Nicholas. Western, Providence and Admiral became parties to the suit. Over a decade after the tragic death of Nicholas, we are once again called upon to resolve insurance coverage disputes. This is the third appeal of the federal action to this court. We previously ruled in unpublished opinions that Beck was entitled to contractual indemnity from Sitka, and that the engineering services exclusion in the Admiral policy did not apply to the estate's claim.[1] The district court had ruled that Sitka was entitled to indemnity from Beck, and as a result Beck proceeded to settle the estate's claims on behalf of both Beck and Sitka. After this court reversed the district court and ruled that Beck was entitled to contractual indemnity from Sitka, the district court entered judgment in favor of Beck. Providence, Admiral, Western and Sitka[2] all paid substantial sums to satisfy the Beck judgment, and continued to litigate among themselves various insurance coverage issues. The district court adjudicated a number of these issues by ruling on motions and cross-motions for summary judgment, and entering final judgments pursuant to Fed.R.Civ.P. 54(b).

The district court ruled, *inter alia,* that (1) the Western excess policy did not cover the Beck indemnity claim, (2) certain fees and costs awarded to Beck were covered by "supplementary payments" provisions in the Admiral and Providence policies, while certain other fees and costs were not covered by these provisions, and (3) Providence breached its obligation of good faith and fair dealing to Sitka by refusing to tender its policy limits

in response to a settlement offer made by the estate after it had won a state court judgment in excess of the primary policy limits. Each of these rulings is contested on appeal. The district court engaged in the difficult task of awarding dollar judgments to reflect the coverage and liability rulings. The ultimate effect of the final judgments was to make Western whole by awarding it the amount it had earlier paid to satisfy the Beck claim (along with prejudgment interest), while imposing substantial dollar judgments on Admiral, Providence and Sitka.

## DISCUSSION

■ We review *de novo* a district court's grant of summary judgment. *20th Century Ins. Co. v. Liberty Mut. Ins. Co.,* 965 F.2d 747, 749 (9th Cir.1992). "Under Rule 56(c), summary judgment is proper when the pleadings and discovery, read in the light most favorable to the nonmoving party, demonstrate that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Id.* at 750. Under Alaska law which applies to this diversity case, "[t]he construction of an insurance contract is a matter for the court, unless its interpretation is dependent upon the resolution of controverted facts." *O'Neill Investigations, Inc. v. Illinois Employers Ins. of Wausau,* 636 P.2d 1170, 1173 (Alaska 1981).

### A. *The Western Excess Policy*

The district court ruled that the Western excess liability policy did not cover the contract indemnity claim made by Beck against Sitka. Sitka and Western cross-moved for summary judgment on this issue. As a "following form" umbrella policy, the Western policy covered only claims for which there was underlying primary coverage. The

**1.** *R.W. Beck & Assoc. v. City and Borough of Sitka,* No. 86–3856 (9th Cir. Feb. 28, 1987); *R.W. Beck & Assoc. v. City and Borough of Sitka,* No. 90–35708, 1991 WL 268718 (9th Cir. Dec. 16, 1991).

**2.** We note that Sitka is a nominal party in a sense, because a fourth insurer, Great Southwest Fire Insurance Company, has also issued an excess policy to Sitka covering damages exceeding other available insurance. This insurer has stat-

ed, in support of its unsuccessful motion to intervene, that it will cover any judgment against Sitka not payable by Providence, Admiral or Western, "subject only to the limitations of the Great Southwest Fire Insurance Company policy, none of which have, to date, been applicable." We conclude, however, that the existence of this fourth policy in no way alters our analysis of the issues presented.

Western contractual liability endorsement provided:

> This policy shall not apply to liability assumed by the insured under any contract or agreement unless such liability is covered by valid and collectible underlying insurance as described in the schedule of underlying policies, and then only for such hazards for which coverage is afforded under said underlying policies.

Sitka argues that both the Providence and Admiral policies provided such underlying primary coverage.

### 1. *The Admiral Policy*

■ Sitka argues that the Admiral policy was an underlying policy covering Sitka's contractual liability, and that Western's excess policy therefore covered the Beck claim. The Admiral policy covered Sitka as a named insured against contractually assumed liability. The Western contractual liability endorsement states that it will not provide coverage for contract liability "unless such liability is covered by valid and collectible underlying insurance as described in the schedule of underlying policies. . . ." The Admiral policy was not included in the schedule of underlying policies. Sitka argues that the use of the word "as" in the Western policy is ambiguous and could mean "such as" the policies listed in the schedule. We find this argument an attempt to create an ambiguity where none exists. "Where the terms of the policy are clear and unambiguous, we will, of course, give effect to the language." *Werley v. United Serv. Automobile Ass'n,* 498 P.2d 112, 116 (Alaska 1972).

We agree with the district court that the Western policy unambiguously provided that coverage only extends to claims covered by primary policies listed in the schedule. Sitka's proposed interpretation of the policy is not only inconsistent with the plain words of the policy, but is also strained and unreasonable, since such an interpretation would obligate Western to provide excess coverage for all underlying policies, whether known or unknown to Western. Courts "should not do violence to the plain terms of a[n] .[insurance] contract by artificially creating ambiguity where none exists. In situations in which reasonable interpretation favors the insurer and any other would be strained and tenuous, no compulsion exists to torture or twist the language of the contract." *Jarvis v. Aetna Casualty & Sur. Co.,* 633 P.2d 1359, 1363 (Alaska 1981).

■ Sitka also argues that its position is supported by Conditions H and N of the municipalities amendatory endorsement of the Western policy. Condition H addresses other insurance and provides that "[i]f other collectible insurance with any other insurer is available to the insured covering a loss covered hereunder . . . the insurance hereunder shall be in excess of, and not contribute with, such other insurance." Condition N is a warranty by the insured "that underlying policy(ies) listed in Schedule A, or renewals or replacements thereof not more restrictive in coverage, shall be maintained in force during the currency of this policy. . . ." Read in their entirety[3] these conditions, like other conditions stated in this part of the policy, were intended to protect the excess

---

3. Condition H states: "If other collectible insurance with any other INSURER is available to the INSURED covering a loss covered hereunder, except insurance purchased to apply in excess of the sum of the RETAINED LIMIT and LIMIT OF LIABILITY hereunder, the insurance hereunder shall be in excess of, and not contribute with, such other insurance. If collectible insurance under any other policy(ies) of the COMPANY is available to the INSURED, covering a loss also covered hereunder (other than underlying insurance of which the insurance afforded by this policy is in excess), the COMPANY'S total liability shall in no event exceed the greater or greatest limit of liability applicable to such loss under this or any other such policy(ies). If other collectible insurance under any policy(ies) of the COMPANY is available to the insured, the ULTIMATE NET LOSS as the result of any one OCCURRENCE not covered by underlying insurance shall not be cumulative."

Condition N states: "It is warranted by the Insured that the underlying policy(ies) listed in Schedule A, or renewals or replacements thereof not more restrictive in coverage, shall be maintained in force during the currency of this policy, except for any reduction in the aggregate limit(s) contained therein solely by payment of claims in respect of OCCURRENCES happening during the period of this policy. In the event of failure by the INSURED to maintain such policy(ies) in force, the Insurance afforded by this policy shall apply in the same manner it would have applied had such policy(ies) been so maintained in force.

carrier and were not intended to expand coverage. They do not alter or vary the requirement in the contractual liability endorsement that contractual liability coverage extends only to claims covered by policies listed in the schedule.

### 2. *The Providence Policy*

■ Sitka had one-year policies with Western and Providence running from July 1, 1982 to July 1, 1983. The Providence policy (unlike the Admiral policy) was listed in the schedule of underlying policies in the Western policy, but it did not have a contractual liability provision. As the Providence and Western policies were written, the Western policy did not cover the contract indemnity claim by Beck, since there was no contract liability coverage in the scheduled primary Providence policy. However, in October of 1984, after the Providence policy had expired and after the estate had obtained a favorable jury verdict, Sitka and Providence agreed to a "voluntary reformation" of the Providence policy. Providence issued Endorsement No. 10, which was made retroactive to July 1, 1982, and provided coverage for contractual liability claims such as the Beck claim. Sitka contends that the failure to include a contract liability endorsement in the Providence policy was the result of a mutual mistake. Western contends that this retroactive change to the underlying policy is not binding on it.

The district court concluded that Providence and Sitka had intended the Providence policy to contain a contractual liability provision and that Providence "agreed to the af-

ter-the-fact addition of such coverage in recognition of admitted, inadvertent clerical errors or oversights which resulted in the omission of that coverage although it had been duly and timely requested." However, the court held that such a retroactive change was not binding on Western. It stated:

> Western World was not involved in [Providence's] error in assembling the policy documents which omitted coverage for contractually assumed liability. Possibly Western World would have accepted the excess risk in question with the [Providence] policy including contract coverage. Possibly reformation would bind Western World if there had been no claims and therefore no prejudice to Western World when the coverage error was discovered. It is quite another matter, and involves extreme prejudice to Western World, for [Providence] and Sitka to reform the [Providence] policy after the policy term within which a serious loss occurred. As to Western World, the reformation is ineffectual.

■ As a federal court sitting in diversity the district court was obliged to apply Alaska law to this issue, and we review *de novo* the district court's determination of state law. *Salve Regina College v. Russell,* 499 U.S. 225, 225–26, 231, 111 S.Ct. 1217, 1218, 1221, 113 L.Ed.2d 190 (1991). At the outset, we agree with the district court's factual conclusion that Sitka established that the failure to include a contractual indemnity provision in the Providence policy was the result of an inadvertent mutual mistake on the part of Providence and Sitka.[4] These contracting

---

4. Several employees of Sitka and Providence testified in deposition that Sitka had requested contractual liability coverage and that the failure to include a contractual liability provision in the Providence policy was an inadvertent oversight. An affidavit of Sitka's insurance broker supports the same conclusion. Providence admitted in an answer in a related state court proceeding that "Sitka ... intended to purchase and did purchase, insurance coverage from Providence adequate to cover ... claims which result from contractual liability such as those asserted by Beck...." Providence never denied coverage of the Beck claim, and defended Sitka on this claim without reservation. Western points out that the prior year's Providence policy (for 1981–82) also lacked a contractual liability provision, but the deposition testimony indicated that this omission

was likewise an inadvertent oversight. The 1979–80 and 1980–81 policies did cover contractually-assumed liability. The written application for the 1981–82 year requested broad form contractual liability coverage. Sitka had requested that the policy be renewed "as is" for the following year, during which the Nicholas accident occurred. Western also argues that Providence had a financial incentive to agree to the reformation, since otherwise it faced a negligence claim from Sitka for failing to include the contractual liability provision. Of course this argument cuts both ways, since by agreeing to issue Endorsement No. 10 Providence was evidencing its alleged error in failing to provide the coverage requested. In any event, we find these arguments insufficient to defeat Sitka's motion for

parties were therefore entitled, *inter se*, to correct the error in their contract by a voluntary reformation not requiring any court action or approval.[5]

We further conclude, after an independent review of the record, that Sitka established as a matter of law that Western did not rely on the error in the Providence policy when Western issued its excess policy. The summary judgment evidence established that Western did not even see a copy of the Providence policy before it issued the excess policy. Further, evidence was offered that when Sitka first made an oral inquiry into obtaining excess coverage, it informed Western that the Providence policy would include a contract liability provision, and its application for umbrella insurance stated that the

underlying policies would contain at least some form of contract liability coverage.[6] Evidence was also offered that when Western finally did receive a copy of the Providence policy, it noticed the absence of a contract liability provision, but did not inform Sitka of this apparent error, did not adjust its premium downward, and was not concerned because under its "following form" excess policy it faced no exposure on claims not covered by an underlying primary policy.[7]

We disagree with the district court's legal conclusion—that the voluntary reformation of the Providence policy is not binding on third party Western because Western would be adversely affected by this reformation. The parties can cite us to no Alaska authority

---

summary judgment. Arguments based on conjecture or speculation are insufficient to raise a genuine issue of material fact, since "there is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986) (citations omitted). Furthermore, in one of its appellate briefs Western admits that the omission of the contractual liability provision was the result of "the obviously negligent failure of Providence Washington to procure the insurance requested by Sitka," thus conceding that the omission was accidental.

5. Western claims that Sitka's relief should come in the form of a negligence claim against Providence. It cites case authority that (1) reformation is inappropriate when there is an adequate remedy at law, (2) reformation requires proof of the parties' intent by clear and convincing evidence, and (3) reformation is subject to the defense of unclean hands. It also argues that the reformation here is barred by the contractual limitations period, and that a party seeking reformation must acknowledge the terms of the policy and is therefore bound by the time limitation for bringing claims stated in the policy. We find these arguments misplaced, since the authorities cited concern the typical reformation situation where one contracting party sues the other contracting party for reformation, seeking to invoke the court's equitable power. Sitka and Admiral did not need to invoke the court's equitable jurisdiction. They reformed the contract themselves. Hence, we think Western mischaracterizes the issue when it argues on appeal that "Sitka primarily argues that the District Court erred in failing to reform equitably the Western World

policy to require Western World to cover Sitka's contractual liability to Beck." Sitka is not trying to reform the Western policy; it is trying to enforce that policy. Similarly, the limitations case cited by Western, *Austin v. Fulton Ins. Co.*, 444 P.2d 536 (Alaska 1968), concerned a suit by one contracting party against another contracting party seeking court-imposed reformation. Here the contracting parties voluntarily reformed their contract, and we are unaware of any statutory or common law time limitation for voluntary reformation to a contract.

6. The application had boxes for "blanket contractual liability" and "specific contractual liability" when it asked for a description of underlying policies. The box for "specific contractual liability" was checked. There is no evidence that "specific contractual liability" insurance would not have covered the Beck claim.

7. John Curry of Western, who handled the Western policy, wrote an internal memorandum summarizing the events as follows: "When the risk was originally presented to me, over the phone, I was told they had contractual liability. When the application came in for issuance, the box was checked indicating specific contractual. However, from past experience, it is our practice to word our policies 'defensively,' thus the following form contractual wording, in case the insured fails to carry the coverage. When we reviewed the insured[']s primary policy in September, we noticed that there was no contractual, but were not concerned since the policy wording excluded contractual coverage unless it was carried at the proper limits." He testified in deposition that upon review of the Providence policy after it was received, "we weren't overly concerned with coverage for the contractual liability because—since we're protected."

addressing a similar fact scenario.[8] Courts from other jurisdictions, however, have addressed very similar circumstances and held that the excess carrier is bound by the reformation of the primary policy if it did not rely on the mistake in the primary policy when it issued the excess policy.

*L.E. Myers Co. v. Harbor Ins. Co.,* 77 Ill.2d 4, 31 Ill.Dec. 823, 394 N.E.2d 1200 (1979) presents facts similar to those here. The plaintiff Myers, a construction contractor, had a primary policy with Continental and an excess policy with defendant Harbor. The Harbor excess policy had a "broad as primary" endorsement,[9] providing, as in our case, excess coverage for which there was underlying primary coverage, and identified the Continental policy as an underlying policy. Certain transmission lines and towers Myers was constructing for a utility were damaged during a windstorm, and the utility sued Myers for the replacement cost of the transmission lines and towers. Myers and Harbor agreed that the Continental policy contained an exclusion which denied coverage of the claim under the Continental policy.[10] Myers, Continental and Myers' insurance broker reviewed the Continental policy exclusion after the windstorm incident and after

Harbor had disclaimed liability by virtue of the exclusion in the Continental policy. They concluded that it was broader than intended and was inserted as a result of a mutual mistake that should be corrected by issuing a revised endorsement. Harbor agreed that Myers and Continental could reform the Continental policy to correct a mutual mistake, but claimed that it was not bound by the reformation. The Illinois Supreme Court held that Harbor was bound by the reformation, since it had not relied on the error in the Continental policy when it issued the excess policy. The ruling turned on the fact that, as here, the excess carrier "did not see a copy of the [primary] policy before issuing its own...." *Id.* 31 Ill.Dec. at 826, 394 N.E.2d at 1203.

Under the reasoning of *Myers,* Western is bound by the reformation of the Providence policy. Indeed, for two reasons the facts here are more compelling than in *Myers.* First, the excess policy in *Myers* provided excess coverage for losses covered by primary policies "for which the insured now has coverage." No such similar language is found in the Western policy. Hence, the excess carrier in *Myers* at least had the

---

**8.** The briefs and the district court cite no Alaska cases directly addressing the circumstances here. Sitka cites a few cases suggesting that Alaska courts take a liberal view toward reformation, and will even reform a contract in cases of unilateral mistake when justice so requires. *E.g. Alaska Foods, Inc. v. American Mfrs. Mut. Ins. Co.,* 482 P.2d 842 (Alaska 1971). However, the Alaska cases cited involved the typical reformation case where one contracting party is suing the other contracting party for reformation. In our case, the contracting parties voluntarily reformed the policy. The district court and Western cite *Slaymaker v. Peterkin,* 518 P.2d 763, 765 (Alaska 1974), which states in *dicta:* "The parties to a contract may, of course, alter its terms, unless intervening rights are involved." *Slaymaker,* however, involved totally different facts and was addressing whether an earnest money contract was sufficiently definite to be enforceable. It was not a reformation or "voluntary reformation" case at all. The district court also cited *Kupka v. Morey,* 541 P.2d 740, 749 (Alaska 1975), which in *dicta* quotes Williston for the proposition that where "a written agreement is not in conformity with the actual intention of the parties in a material matter, a court of equity will reform the writing in accordance with that intention if innocent parties will not be affected there-

by." Factually and legally *Kupka* bears little resemblance to our case. The court was discussing whether a claim for reformation is governed by the parol evidence rule. There was no "voluntary reformation" in that case, and no alleged innocent third party claiming to be adversely affected by the reformation.

**9.** The "broad as primary" endorsement stated: "It is understood and agreed that in the event of loss for which the insured now has coverage under the underlying insurances set out in the attached schedule, the excess of which would be recoverable hereunder, except for terms and conditions of this policy which are not consistent with the underlying, then, notwithstanding anything contained herein to the contrary, this policy shall be amended to follow the terms and conditions of the applicable underlying insurances in respect of such loss." *Myers,* 31 Ill.Dec. at 824, 394 N.E.2d at 1201.

**10.** Indorsement No. 7 to the Continental policy excluded from coverage "property damage to work performed by the named insured arising out of the work or any portion thereof, or out of the materials, parts, or equipment furnished in connection therewith." *Myers,* 31 Ill.Dec. at 824, 394 N.E.2d at 1201.

argument that the excess policy by its own terms expressly prohibited retroactive changes to primary policies which broadened coverage. Second, in our case there was evidence, discussed above, that Western was informed prior to issuing its policy that the underlying Providence policy was to include coverage for contractual liability. *Compare Myers, id.* 31 Ill.Dec. at 826–27, 394 N.E.2d at 1203–04 ("there is no claim made that [Harbor] had been advised by either [Myers or its broker] as to what coverage was provided by the Continental policy."). Here, therefore, the excess carrier not only issued the excess policy before receiving a copy of the primary policy, but was on actual notice that the primary policy would cover contractual liability claims.

*Great Atlantic Ins. Co. v. Liberty Mut. Ins. Co.,* 773 F.2d 976 (8th Cir.1985), also addressed similar facts. Liberty Mutual had issued American Hydrotherm two primary policies and Great Atlantic had issued an excess policy. American Hydrotherm was sued in connection with a plant explosion allegedly caused by a product it designed and manufactured. The suit was settled for an amount in excess of the $500,000 policy limit found in each of the two primary policies. Great Atlantic argued that both of the Liberty Mutual policies should have been tapped before reaching the excess policy. Liberty Mutual argued that one policy was intended to cover the United States and the other Canada, but that due to clerical errors both policies covered the United States. After the explosion, and after Great Atlantic had sued to recover the amount it had paid toward the settlement, Liberty Mutual voluntarily reformed one of the policies to cover Canada. On appeal the court agreed with the district court that Great Atlantic was bound by the voluntary reformation of the primary policy. Again the decision appears to turn on reliance. The court agreed that the evidence established that the policies were reformed to correct a mutual mistake and found no evidence of reliance by Great Atlantic on the error in the primary policy. *Id.* at 979–81.

Here, the summary judgment evidence established as a matter of law that Western did not rely on the absence of a contract liability endorsement when it issued the excess policy. Further, there was no evidence of fraudulent or collusive conduct on the part of Providence and Sitka.[11] On the contrary, the evidence confirmed that Endorsement No. 10 was issued by Providence to correct the policy and reflect the true intent of the parties to that insurance contract.

Under these facts we conclude that Alaska courts would follow the approach taken by other jurisdictions and would find the reformation of the Providence policy binding on Western. By agreeing to "follow the form" of the underlying policies and issuing excess liability insurance without reviewing those policies, Western is bound by a change in an underlying policy to correct a mutual mistake. We therefore reverse the judgment and remand the case to the district court for further proceedings consistent with this opinion.[12]

## B. *Supplementary Payments Provisions*

▇▇▇ The Admiral and Providence policies had "supplementary payments" provisions providing for payment of certain costs and expenses incurred by or taxed against the insured. The significance of these provisions is that they provide for payments to Sitka over and above the $500,000 policy limits on each policy. The Beck settlement of the estate's claims for $3,750,000 well exceeded the combined limits on the primary policies.

Attorneys' fees and other court costs were incurred by Beck in two separate proceed-

---

11. *Compare Great Atlantic,* 773 F.2d at 981 (noting that "there is no suggestion that [the insured] and [the primary carrier] acted fraudulently or collusively to harm [the excess carrier].")

12. Although we conclude that the district court should have granted Sitka's motion for summary judgment as well as denying Western's, we do not find it appropriate to reverse and render judgment in favor of Sitka. A ruling in favor of Sitka on this issue necessarily raises questions as to attorneys' fees (including fees for this appeal), interest, costs, what funds have actually changed hands as a result of the district court's prior rulings, and probably other questions as well. The district court is in a far superior position to address these questions, and accordingly we remand the case.

ings: the original state court wrongful death suit brought against Sitka and Beck, and the federal contract indemnity suit Beck brought against Sitka. The district court held that the costs and attorneys' fees assessed against Sitka in the contract indemnity suit were covered by the supplementary payments provisions. However, the court found that the costs and fees incurred by Beck in the wrongful death suit, which were awarded to Beck in the contract indemnity suit, were "damages" rather than "costs" covered by the supplementary payments provisions.

In appeal No. 92–36627, Sitka and Western argue that the fees and costs Beck incurred in the wrongful death suit should have been treated as costs under the supplementary payments provisions, and Admiral argues that the district court was correct. In appeal No. 92–36558, Providence argues that the district court erred in treating Beck's fees and costs in the contract indemnity suit as covered by the Providence supplementary payments provision, and Western argues that the district court was correct.[13]

The Providence supplementary payments provision states:

> [Providence] will pay, in addition to the applicable limit of liability:
>
> (a) All expenses incurred by [Providence], all costs taxed against [Sitka] in any suit defended by [Providence] and all interest on the entire amount of any judgment. . . .

The Admiral policy is virtually identical. The district court reasoned as follows:

> The costs and attorneys' fees in [the wrongful death action] were incurred by Beck, and while the same have been passed on to Sitka, that has happened as a consequence of the indemnity provision between Sitka and Beck, not because of the direct taxing of costs and fees by the court. Moreover, the costs and fees in question were not in any sense the result of a suit

against the insured, Sitka. The costs and fees in question were incurred by Beck in its joint defense with Sitka of the Nicholas claim. Claims against Sitka derived from the Nicholas claim would certainly be within the scope of the supplemental payments provisions. The costs and fees which are at issue, however, derived directly from Beck's defense of the Nicholas suit and were passed on to Sitka by the court pursuant to the Beck/Sitka indemnity agreement, as to which both Admiral and Providence have tentatively been determined to provide coverage. . . . [T]he Beck costs and fees are more properly characterized as "damages" which fall within the $500,-000 limits of the Providence and Admiral policies. . . . Conversely, the amount of fees and costs incurred by Beck in the federal court *Beck v. Sitka* action are properly characterized as supplemental payments and are therefore payable by the primary insurers, Admiral and Providence Washington.

We agree with the district court's reasoning and result. The state court did not "tax" Beck's fees and costs in the wrongful death suit to Sitka. Those expenses incurred by Beck were awarded to Beck by virtue of the broadly-worded indemnity provision in the service contract between Beck and Sitka. The provision states that Sitka will "indemnify, defend and hold harmless" Beck "from all claims, liabilities, losses and expenses" in excess of its contract fee for "damages or liabilities of any kind or nature, including but not limited to . . . injury to or death of any persons . . . arising out of . . . performance of this Agreement. . . ." Providence and Admiral covered those expenses imposed on Sitka because their policies had contract liability endorsements covering "damages," which the insured became legally obligated to pay because of assumed contractual liability,[14] not because they had supplementary

---

**13.** In this context "costs" include attorneys' fees. *See Liberty Nat'l Ins. Co. v. Eberhart,* 398 P.2d 997, 999 (Alaska 1965) (insurance policy provision providing for payment of "costs taxed against the insured" covered attorneys' fees).

**14.** The Providence contractual liability endorsement provided that Providence:

> will pay on behalf of the Insured all sums which the Insured, by reason of contractual liability assumed by him under any written contract of the type designated in the schedule for this insurance, shall become legally obligated to pay as damages because of
>    bodily injury or
>    property damage

payments provisions. This liability to Sitka is best characterized as "damages" suffered by Beck because of breach of the indemnity agreement. *See Heritage v. Pioneer Brokerage & Sales, Inc.,* 604 P.2d 1059, 1067 (Alaska 1979) ("[I]n actions of indemnity, brought where the duty to indemnify is either implied by law or arises under contract ... reasonable attorneys' fees incurred in resisting the claim indemnified against may be recovered as part of the damages and expenses.") (quoting *Addy v. Bolton,* 257 S.C. 28, 183 S.E.2d 708, 710 (1971)).

■ On the other hand, the fees and costs incurred by Beck in prosecuting the indemnity claim were separately taxed against Sitka by the federal court under Alaska law governing the award of attorneys' fees and costs to a prevailing party in a contract indemnity action. We think they are typical of the fees and costs intended to be covered under a standard supplementary payments provision. Arguably these fees and costs also fell, albeit indirectly, within the indemnity agreement between Beck and Sitka and the contract liability endorsements in the policies. "The test for coverage is the reasonable expectation of a lay person." *Allstate Ins. Co. v. Ellison,* 757 F.2d 1042, 1044 (9th Cir.1985) (applying Alaska law). We certainly think that a reasonable lay person could view these fees and costs separately awarded by the district court as "costs taxed" under the supplementary payments provisions, rather than "damages" Sitka became legally obligated to pay because of bodily injury under the contract liability endorsements. Treating them as falling under the supplementary payments provisions had the effect of increasing coverage under the policies. Where language in an insurance contract is reasonably susceptible to either of two interpretations, the court will apply the interpretation that favors the insured by providing broader coverage. *Starry v. Horace Mann Ins. Co.,* 649 P.2d 937, 939 (Alaska 1982).

## C. *Providence's Failure to Tender Policy Limits*

■ The state court entered judgment against Beck and Sitka, jointly and severally, in the amount of $3,657,467.09. The jury had allocated 50 percent of the negligence to Sitka, 40 percent jointly to Beck and its employee Paul Carson, and 10 percent to Nicholas. While the appeal of the state court action was pending, the estate offered to settle with Sitka only for $1,434,029.20, an amount the estate viewed as the total amount of coverage (including supplementary payments coverage) under the Providence and Admiral policies. As the excess carrier who faced exposure if the ultimate liability to Sitka exceeded the primary policy limits, Western made demand on Admiral and Providence to accept the offer. Admiral agreed to tender its policy limits but Providence refused. Providence had offered to tender its limits only if Admiral would agree to withdraw an indemnity claim against Sitka, and Admiral would not agree to do so. Thereafter Beck settled with the estate for $1.5 million, and, after the federal district court initially ruled that Beck must indemnify Sitka, Beck settled the estate's claims against Sitka for $2,250,000. We then reversed the district court's judgment and ruled that Sitka must indemnify Beck under their contract.

On remand, in deciding which of Sitka's insurers owes what, the district court first ruled that Providence breached its duty of good faith and fair dealing by refusing to tender its policy limits in response to the estate's settlement offer. We agree. The Alaska Supreme Court has stated:

> If a plaintiff makes a policy limits demand and there exists a substantial likelihood that a verdict will be rendered against the insured in excess of the coverage provided by the policy of insurance, the insurer has a duty to tender as settlement of the claim the maximum limits of insurance coverage.

*Schultz v. Travelers Indem. Co.,* 754 P.2d 265, 266–67 (Alaska 1988).

We recognize that the central issue in *Schultz* was whether court-awarded attorneys' fees were part of an insurer's general liability policy limits. *But see Bohna v.*

---

to which this insurance applies, caused by an occurrence....

The Admiral endorsement is virtually identical.

*Hughes, Thorsness, Gantz, Powell and Brundin*, 828 P.2d 745, 768 (Alaska 1992); *Tucker v. United Services Auto Ass'n*, 827 P.2d 440, 441 (Alaska 1992). Moreover, the Alaska Supreme Court has not addressed the precise issue before us: whether an insurer's refusal to tender policy limits in response to a settlement offer made after a judgment has been entered in excess of the offer is a breach of its duty to the insured as a matter of law. The district court correctly noted that Alaska cases on this subject have looked to California cases.[15] "In the absence of a supreme court decision on the subject in question, we look to other state-court decisions, well-reasoned decisions from other jurisdictions, and any other available authority to determine the applicable state law." *Burns v. International Ins. Co.*, 929 F.2d 1422, 1424 (9th Cir.1991).

The California Supreme Court has addressed an insurer's refusal to tender the policy in response to a settlement offer made after a judgment has been entered against the insured in excess of the offer. In *Samson v. Transamerica Ins. Co.*, 30 Cal.3d 220, 178 Cal.Rptr. 343, 636 P.2d 32, 46 (1981), the court stated:

> It is true that the reasonableness of a rejected settlement offer is often an issue of fact to be determined by a jury.... However ... in this context ... "[t]he only permissible consideration in evaluating the reasonableness of the settlement offer becomes whether, in light of the victim's injuries and the probable liability of the insured, the ultimate judgment is likely to exceed the amount of the settlement offer".... In this case, the judgment against the insured had already been entered, and concededly exceeded the amount of the settlement offer. Thus, as a matter of law, the settlement offer was reasonable and was wrongfully rejected by Transamerica.

*See also Bohna*, 828 P.2d at 768 (agreeing with trial court ruling that insurer breached its obligation of good faith and fair dealing

"as a matter of law."). *Samson* holds that it is a breach of the insurer's duty to the insured as a matter of law to refuse an offer to settle within the policy limits once a judgment has been entered in excess of the offer. We agree with the district court that Alaska courts would reach the same result. The judgment was substantially in excess of the primary policy limits, and the settlement offer was less than half the amount of the judgment. None of the parties argue that the judgment suffered from some legal or factual infirmity that made reversal likely in the Alaska appellate courts.

■ California and other jurisdictions recognize that the excess carrier is entitled to equitable subrogation to the rights of the insured and may make the same bad faith claims that the insured could have made. *E.g., Commercial Union Assurance Cos. v. Safeway Stores, Inc.*, 26 Cal.3d 912, 164 Cal. Rptr. 709, 610 P.2d 1038, 1041 (1980) ("Since the insured would have been able to recover from the primary carrier for a judgment in excess of policy limits caused by the carrier's wrongful refusal to settle, the excess carrier, who discharged the insured's liability as a result of this tort, stands in the shoes of the insured and should be permitted to assert all claims against the primary carrier which the insured himself could have asserted...."). Such a rule seems eminently sound, and again, we agree with the district court that Alaska courts would follow it. Therefore Western was allowed to pursue the claim for indemnity for the wrongful death liability against Providence.

Providence argues that under the applicable Alaska contribution statute, Alaska Stat. § 09.16.010 (repealed 1987), contribution among joint tortfeasors is pro rata, and that Sitka was therefore only liable for one-third of the Nicholas judgment, since Beck and Carson were also found liable. This argument is misguided because the contribution statute does not apply if one defendant is entitled to indemnity from another. *Id.*

**15.** *E.g., State Farm Fire & Cas. Co. v. Nicholson*, 777 P.2d 1152, 1155–56 (Alaska 1989) (relying on *Gruenberg v. Aetna Ins. Co.*, 9 Cal.3d 566, 108 Cal.Rptr. 480, 510 P.2d 1032 (1973)); *Schultz*, 754 P.2d at 266–67 (relying on *Crisci v. Security Ins. Co. of New Haven*, 66 Cal.2d 425, 58 Cal. Rptr. 13, 426 P.2d 173 (1967)); *Guin v. Ha*, 591 P.2d 1281, 1291 (Alaska 1979) (relying on *Crisci* and *Comunale v. Traders & Gen. Ins. Co.*, 50 Cal.2d 654, 328 P.2d 198 (1958)).

§ 09.16.010(f). Further, the statute only governs the liability of joint tortfeasors *inter se,* and here the judgment entered against Sitka was joint and several, exposing Sitka to the full amount of the judgment. *See Arctic Structures, Inc. v. Wedmore,* 605 P.2d 426, 436–37 (Alaska 1979) (passage of contribution statute did not alter the rule of joint and several liability, i.e., that concurrently negligent tortfeasors are each liable for the full amount of the judgment where the co-defendants are insolvent).

One unusual wrinkle on this issue that distinguishes it from other cases is that the settlement demand, even if accepted, would not necessarily have completely extinguished Sitka's liability. The settlement offer was contingent on preserving the estate's right to pursue a recovery from Beck. At that time Beck was pursuing its indemnity claim against Sitka in federal court, and the district court had not yet ruled on this claim. These facts, however, do not alter our conclusion. The summary judgment record does not establish what effect the rejection of the settlement offer had on the estate's negotiations with Beck. However, we can only assume that Providence's refusal to settle could have only increased the estate's interest in pursuing a recovery from Beck, and Beck's interest in pursuing its indemnity claim against Sitka. These circumstances could have only increased the likelihood of a total exposure to Sitka in excess of the settlement offer. We fail to see how the additional risks facing Sitka by virtue of the Beck indemnity claim altered Providence's duty to accept the estate's settlement offer.[16]

Providence also argues that its failure to tender policy limits did not result in any injury to Sitka. Assuming this causation argument was raised below and properly preserved for appeal (which Western and Admiral dispute), there is no dispute that (1) the estate offered to settle with Sitka for $1,434,-029.20, (2) Beck ultimately settled Sitka's liability to the estate for $2,250,000, and (3) Beck recovered this amount (plus interest) from Sitka when the federal court granted Beck contractual indemnity from Sitka. Providence points to no competent summary judgment evidence which disputes or explains away this apparent injury.

## CONCLUSION

We reverse the summary judgment because of the ruling in favor of Western on the issue of its excess coverage of the Beck claim, and we remand for further proceedings consistent with this opinion.

Costs should be taxed one half to Western World Insurance Company and one half to Providence Washington Insurance Company.

REVERSED and REMANDED.

---

16. *See also Johansen v. California State Auto. Ass'n Inter–Ins. Bur.,* 15 Cal.3d 9, 123 Cal.Rptr. 288, 538 P.2d 744, 748–49 (1975) ("[T]he only permissible consideration in evaluating the reasonableness of the settlement offer becomes whether, in light of the victim's injuries and the probable liability of the insured, an ultimate judgment is likely to exceed the amount of the settlement offer. Such factors as the limits imposed by the policy, a desire to reduce the amount of future settlements, or a belief that the policy does not provide coverage, should not affect a decision as to whether the settlement offer in question is a reasonable one.").